GELDERMANN AND COMPANY, INC., Appellee,

v.

LANE PROCESSING, INC., Appellant.

No. 75–1145.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1975.

Decided Dec. 12, 1975.

Robert V. Light, Little Rock, Ark., for appellant.

James L. Fox, Chicago, Ill., for appellee.

Before GIBSON, Chief Judge, and LAY and STEPHENSON, Circuit Judges.

GIBSON, Chief Judge.

In this diversity case the appellant, Lane Processing, Inc., appeals from a judgment entered upon an adverse jury verdict on its counterclaim[1] against appellee Geldermann and Company, Inc., for punitive and compensatory damages for breach of contract and conversion. Geldermann and Company, Inc., is a licensed commodity broker on the Chicago Board of Trade. Lane Processing,[2] a sophisticated trader on the commodities market, was playing the market short during the onset of the bizarre commodity market of 1972–1973 when extreme and adverse climatic conditions, combined with the Russian wheat deal of the summer of 1972, skyrocketed commodity prices to historic highs.

Lane Processing uses large amounts of corn and soybean meal in milling its own feed. Most of its purchases are made on the cash market through its broker, J. W. Nutt Co. of Little Rock, Arkansas. Lane Processing opened a futures trading account with the J. W. Nutt Co. in August of 1969 for the purpose of trading in iced broiler[3] futures contracts. Then in October, 1972, Lane Processing made an agreement with J. W. Nutt Co. to trade in commodity futures on the Chicago Board of Trade. J. W. Nutt Co. was not a futures commission merchant on the Board of Trade but had a relationship with Geldermann whereby the J. W. Nutt Co. would communicate orders to Geldermann, who would execute them on the floor of the exchange.

Lane Processing's account was reflected on Geldermann's records and, when selecting the type of futures agreement under which it would be operating, Lane Processing agreed that its futures account would be a "hedge" account, which signified that Lane Processing would maintain a position in a commodity to offset or balance its position in the futures market. During the next several weeks, Lane Processing became a short seller[4] of substantial futures contracts in corn, soybeans and soybean meal. However, Lane Processing's trading in futures was speculative in nature since it was long on only an insignificant number of broilers to offset its numerous short futures contracts and the short futures were far greater than its corn and soybean inventory.[5]

The price of grain advanced rapidly in November and early December of 1972. The rules of the Board of Trade required

1. Geldermann and Company, Inc., instituted this action for the balance due on a trading account after liquidating Lane Processing's short position. Lane stipulated liability on the initial claim and the case was basically tried on the contentions alleged in the counterclaim.

2. Lane Processing is an integrated poultry operation owned by Clift Lane and his wife, Dorothy, operating multi-state with headquarters at Grannis, Arkansas. It employs up to 2,000 people, raises about 50 million broiler chickens a year and had a sales volume of $50 million in 1972.

3. Broilers are young chickens which generally weigh about 2½ pounds dressed.

4. In commodities transactions, a person who sells "short" has sold a commodity for future delivery with the hope that prices will decrease before he has to produce the commodity (or its equivalent in money) on the delivery date. An investor who has gone "long" has purchased a futures contract with the hope or expectation that there will be an increase in prices.

5. If Lane Processing had carried an actual inventory of commodities equivalent to its short position, the market rise on inventory would compensate for the loss on the short futures. Also, Lane had no offsetting long position in corn and soybean meal. Lane did have a long position in broilers.

customers to maintain a certain margin on their accounts. Lane Processing, by signing a commodity signature card when it commenced futures trading in 1969, agreed to properly margin the account. With the advancing market Geldermann was forced to make a number of margin calls on Lane Processing's account. Clift Lane was accustomed to meeting these margin calls by mailing a check to J. W. Nutt Co., which would in turn forward the check to Geldermann. The result was that a check would not clear for five to seven days. As the daily margin calls became more substantial,[6] Geldermann desired that Lane utilize a more expeditious means of meeting margin calls. John Nutt, a partner in the J. W. Nutt Co., testified that he advised Lane on two occasions to forward checks directly to Geldermann since Nutt was not authorized to accept funds for trading in regulated commodities on the Board of Trade. However, with one exception, Lane continued to make the checks payable to Nutt and to send them to Nutt's office in Little Rock.

On December 5 Geldermann's concern with Lane Processing's account prompted a telegram to Lane which requested an immediate wire transfer[7] of $225,000 to meet the present margin deficiency on the account. Upon receipt of the telegram Lane contacted Nutt to state that he did "not keep that much money just laying around" and that it would take a while to obtain it. Lane testified that Nutt contacted Geldermann and received approval for Lane to continue sending checks. Nutt testified that he did not recall contacting Geldermann on this matter or informing Lane that wire transfer of funds was unnecessary.

After the closing of the market on December 12, 1972, Lane received a margin call of $206,000. Lane Processing had lost approximately $830,000 in the first twelve days of December and members of the Geldermann firm convened a meeting to discuss Lane Processing's account in light of its substantial losses and margin deficiencies. Tom Geldermann, president of Geldermann, then contacted Nutt for the purpose of obtaining financial information concerning Lane. Thereafter, at approximately 5:45 p. m., Tom Geldermann telephoned Lane to discuss the account. The testimony of Tom Geldermann indicates that Lane was informed that if Lane did not decide to wire transfer $206,000 to Geldermann's office by the opening of the exchange on December 13, the account would be liquidated. Lane denies that he was presented with such a proposition and contends that Tom Geldermann only encouraged him to sell some of his futures contracts. After this conversation Tom Geldermann then contacted Nutt to state that he was less concerned with Lane Processing's account since Lane had agreed to decide whether to wire transfer the money or liquidate the account. Nutt testified that he called Lane on December 12 to encourage Lane to wire transfer funds to Chicago pursuant to Geldermann's request. Lane contacted Nutt later that evening to order only a partial liquidation of Lane Processing's account.

On the afternoon of December 12 Tom Geldermann sent a telegram to Lane requesting a wire transfer of $206,650 before the opening of the exchange on December 13. The telegram concluded by providing that "if transfer is not completed by this time we may be forced to

---

6. Lane Processing's account reflected the following margin deficiencies for the days immediately preceding liquidation:

| | |
|---|---|
| December 4 | $208,641 |
| December 5 | 305,138 |
| December 6 | 288,431 |
| December 7 | 17,136 |
| December 8 | 128,996 |
| December 11 | 229,633 |
| December 12 | 198,540 |

While the original margin call to Lane Processing on December 12 was approximately $206,000, it was later determined that the proper call was $198,540.

7. "Wire transfer" is an inter-bank, electronic transmission of funds which was used by nearly all of Geldermann's customers who maintained substantial accounts. Such a transfer can be verified by telephone in a matter of minutes.

begin liquidation of the commodity position in your account * * *." This telegram was sent on advice of counsel to confirm Geldermann's prior oral request for wire transfer of funds. Lane did not receive the telegram until December 14.

Tom Geldermann testified that the following events occurred on the morning of December 13. At approximately 8:45 a. m. he contacted Lane to inquire as to whether Lane had decided to wire the funds or liquidate the account. Lane stated that he had made no decision but did not plan to wire transfer the money. Lane then stated that he felt the margin call was seven or eight thousand dollars too high and asked Tom Geldermann if any of Lane's checks had been received. It was ascertained that no checks had been received to decrease the present margin call and Lane was informed that the margin call remained intact. Lane informed Tom Geldermann that he wanted to think the matter over until 9:10 a. m., which was 20 minutes before the market opened.

At that time Tom Geldermann contacted Lane, presented him with the same option of wire transfer or liquidation and stated that he felt Lane Processing should liquidate all of its contracts. Lane responded by saying "all right." The liquidation of the short position would be accomplished by purchasing an equivalent amount of futures. Tom Geldermann then asked Lane if Geldermann had an order from Lane to purchase sufficient commodity futures contracts to liquidate the short position. Lane gave an affirmative response.

Lane disputes the substance of these conversations and denies giving Geldermann authorization to liquidate. He does admit that during the latest conversation at 9:10 a. m. Tom Geldermann told him to either wire transfer the margin call or his whole account would be liquidated. At 9:30 a. m. Geldermann commenced liquidation of Lane Processing's account and all purchases had been consummated by 9:50 a. m. at a loss to Lane Processing in excess of $1,000,000.

It was subsequently determined that Lane Processing owed Geldermann $86,960 as a result of the balance due after liquidation. This figure was subsequently reduced to $23,013 after Geldermann offset profits from Lane Processing's nonregulated commodities account against the balance due. Geldermann commenced the present litigation to recover this reduced amount.

In its counterclaim Lane Processing contended that the basic terms of the commodity signature card and the provisions of Rule 209 of the Chicago Board of Trade, incorporated in the signature card agreement, were unconscionable and hence unenforceable, and that the liquidation of its short position constituted both a breach of contract and a conversion of its property interest in the short trading position.

The commodities signature card was signed by Lane in August, 1969, when Lane Processing began to trade in iced broiler futures. The card provided:

I hereby agree that all transactions executed for my account are subject to the rules and customs of the exchange (and its Clearing House if any) where executed.

I further agree that I will at all times without notice or demand from you maintain and keep my account fully margined and protected in accordance with your requirements and that you will be kept secure by me against fluctuations of the market price of the commodities in my account.

In case of my failure to maintain with you at all times such margin as you may deem adequate for your protection, you may, without prior demand or notice to me, Sell and/or Purchase such commodities as you may consider necessary to fully protect my account.

Lane Processing specifically contends that the provision permitting liquidation without demand or notice is unconscionable and unenforceable.

Rule 209 of the Chicago Board of Trade reads:

DEPOSITS BY CUSTOMERS.—A member acting as commission merchant for a customer (member or nonmember) may require from such customer a deposit, as indemnity against liability, and subsequent deposits to the extent of any adverse fluctuations in the market price. Such deposits must be made with the commission merchant within a reasonable time after demand, and, in the absence of unusual circumstances, one hour shall be deemed a reasonable time. The failure of the customer to make such deposit within such time shall entitle, but shall not obligate, the commission merchant to close out the trades of the defaulting customer. If the commission merchant is unable to effect personal contact with the customer, a written demand left at the office of the customer, during business hours, shall be deemed sufficient.

Here Lane Processing contends that the provision "in the absence of unusual circumstances, one hour shall be deemed a reasonable time" for the deposit of the required margin after demand is unconscionable and unenforceable.

The jury was instructed that Geldermann could be absolved from liability on either of two theories: (1) Lane authorized liquidation of the regulated commodities account, or (2) Geldermann was acting pursuant to authority vested in it by the commodities signature card executed by Lane. Since the case was submitted to the jury on a general verdict form unaccompanied by written interrogatories, it is not clear which of the alternate theories the jury adopted. Lane Processing seeks reversal only on the basis of the second theory by contending that the commodities signature card and Rule 209 of the Chicago Board of Trade are unconscionable.

█ The doctrine of unconscionability inherent in equitable matters also finds acceptance in the law. In 1889 the United States Supreme Court approved the definition of an unconscionable contract as one which " 'no man in his senses and not under delusion would make on the one hand, and * * * no honest and fair man would accept on the other * * *.' " *Hume v. United States,* 132 U.S. 406, 411, 10 S.Ct. 134, 136, 33 L.Ed. 393 (1889), *quoting Earl of Chesterfield v. Janssen,* 2 Ves.Sr. 125, 28 Eng.Rep. 82 (1750). The doctrine has been in a state of constant evolution and is now codified in § 2–302 of the Uniform Commercial Code.[8] In assessing whether a particular contract or provision is unconscionable, the courts should review the totality of the circumstances surrounding the negotiation and execution of the contract. Two important considerations are whether there is a gross inequality of bargaining power between the parties to the contract and whether the aggrieved party was made aware of and comprehended the provision in question.

Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective

8. Section 2–302 provides in relevant part:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

This provision has been adopted in Arkansas. Ark.Stat.Ann. § 85–2–302 (1961). We do not apply § 2–302 to the present case since the commodities signature card standing alone was not a contract for the sale of "goods." Uniform Commercial Code §§ 2–102, 2–105(1). The card was merely an agreement by Lane Processing to maintain proper margins as a precondition to the performance of services on its behalf by a commodities broker. Even if we were to apply the Uniform Commercial Code by analogy, a different result would not be mandated.

manifestation of his consent, was ever given to all the terms.

*Williams v. Walker-Thomas Furniture Co.,* 121 U.S.App.D.C. 315, 350 F.2d 445, 449 (1965). (Footnote omitted.)

An equally important factor that must be balanced in making this determination is whether the provision is commercially reasonable "according to the mores and business practices of the time and place." 1 A. Corbin, *Contracts* § 128, at 551 (1963). Based on the commercial environment which engendered the provision under attack, the party purporting to uphold the provision must show that the provision bears some reasonable relationship to the risks and needs of the business. *In re Elkins-Dell Manufacturing Co.,* 253 F.Supp. 864, 873 (E.D.Pa. 1966). The fact that the provision is part of a printed "form" contract does not render it automatically unenforceable, particularly when all parties have knowingly assented to the inclusion of the provision. 3 A. Corbin, *Contracts* § 559, at 270 n. 18 (1960). It is not the province of the courts to scrutinize all contracts with a paternalistic attitude and summarily conclude that they are partially or totally unenforceable merely because an aggrieved party believes that the contract has subsequently proved to be unfair or less beneficial than anticipated.

■ Applying these standards to the circumstances surrounding the signing of the commodities signature card, we conclude that the liquidation provision in the card is not unconscionable. Clift Lane, whose net worth approximated $4,598,000 in fiscal year 1972 and $7,000,000 in 1973, was a sophisticated investor and entrepreneur. Since 1962 he had purchased his grain needs for his poultry operation as far as ten months in advance on a cash basis to avoid price fluctuations. In 1969 Lane Processing entered the iced broiler futures market and commenced trading in grain futures in 1972. Lane maintained a teletype machine in his office and was thus able to observe and analyze price fluctuations in the market. The record further shows that Lane was capable of reviewing the commodities trading on a daily basis and calculating his own margin calls with substantial accuracy. He was not the type of person who could be easily deceived or taken advantage of by his commodities broker. *Cf. Williams v. Walker-Thomas Furniture Co., supra.*

Furthermore, Lane read the signature card before signing it and apparently understood the summary liquidation provision.[9] The record supports the conclusion that Lane was not victimized by an overreaching party to the contract. He was aware of his obligations as stated in the signature card and voluntarily assumed the risks inherent in futures trading. Lane was also cognizant of the consequences if he failed to meet the margin calls.

The liquidation provision in the signature card was eminently reasonable in light of the commercial background of futures trading. Observers are well aware that extreme price fluctuations for commodities traded on the Chicago Board of Trade can be triggered by government action, crop reports, weather reports or numerous other variables which may appear to affect the supply and demand of the commodities. The margin requirements of the Board of Trade are substantially lower than those on the New York Stock Exchange and generally do not exceed 10 percent of the price of the commodity.[10] Despite the fact that "limit moves" restrict the

9. Lane testified that he had questioned the provision permitting liquidation without demand or notice and that John Nutt assured him such liquidation "never happened." Nutt testified that he did not recall making such a statement to Lane.

10. The minimum margins required for Lane Processing's hedging account and the approximate price at which each commodity was selling in early trading on December 13, 1972, appear below:

|  | Margin | Price |
|---|---|---|
| Corn | 10¢ per bushel | $1.62 per bushel |
| Soybeans | 15¢ per bushel | $4.33 per bushel |
| Soybean meal | $500 per contract (100 tons) | $14,500 per contract (or $145 per ton) |

degree of fluctuation by closing all trading when a commodity price has increased or decreased to the maximum allowed for the day, investors can still lose substantial sums on a daily basis. This is best exemplified by Lane Processing's account which lost as much as $230,000 per day during December, 1972. Consequently, it is necessary to provide a means whereby a futures commission merchant can expeditiously liquidate those investors' accounts that reflect substantial margin deficiencies. The commission merchant must maintain segregated accounts for each customer and may not commingle funds, 7 U.S.C. § 6d(2) (1970); 17 C.F.R. § 1.20 (1975), so one customer of a commission merchant may not rely upon another customer's margin surplus to balance his own deficiencies. The record indicates that all commission merchants were subject to periodic margin audits by the Commodity Exchange Commission and the Chicago Board of Trade. A merchant could be fined if its customers' accounts were inadequately margined.

It is clear that the liquidation provision promoted the interest and protection of the commission merchants, their customers and the investing public as a whole. Investors or speculators who have failed to deposit sufficient maintenance margins may have insufficient financial resources to withstand substantial losses on the market and, if so, continued trading on that account is a financial risk for the commission merchant, and ultimately for the commodities exchange if the loss suffered by the commission merchant exceeds its capital account. Imposing requirements of demand and notification, particularly where it may be extremely difficult or time-consuming to contact an investor, would violate the manifest purpose of the liquidation provision. Based upon the foregoing, the District Court properly held as a matter of law that this provision in the commodity signature card is not unconscionable and unenforceable.

In fact, there appears to be no actual or legal unconscionability under the circumstances of this case. Geldermann's net worth was approximately $1,000,000. Lane Processing was in a debit balance position with Geldermann on five of eight trading days in December, 1972, with margin deficiencies ranging from $17,000 to $305,000. Geldermann at one time under the rules of the clearing house of the Board of Trade had to obligate its own funds to supply up to $444,000 to make up margin deficiencies and debit balances of Lane Processing. For this service and financial risk Geldermann received no interest and only $13,000 in commissions, of which one-half went to its correspondent broker, J. W. Nutt Co. Although Lane lost about $1,200,000, it cannot be fairly hypothesized or rationalized that this loss was attributable to the way in which Geldermann handled the account. Lane, as a knowledgeable speculator, just guessed wrong in taking a short position in the bizarre rising market of 1972–1973. Actually, Lane Processing's breach of its agreement to keep its account properly margined as agreed and suffering its own accounts to get into serious debit balance impaired Geldermann's own funds and financial standing. Consequently, there is no real issue of unconscionability on the liquidation and notice clauses under attack in this case.

Lane Processing has little reason to complain about the liquidation procedure in this case. Its short position was not liquidated without notice. Lane was notified of the impending liquidation and was given an opportunity to avert it by initiating a wire transfer of the margin deficiency to Geldermann. Lane was aware on December 12 that Geldermann was properly concerned with the Lane Processing account. John Nutt and Tom Geldermann testified that demands for wire transfers were made to Lane on that day. Lane admitted that at 9:10 a. m. on December 13 Tom Geldermann said the account would be liquidated if the money were not wire transferred to

Chicago. At no time did Lane make any overtures to initiate a wire transfer of funds to Geldermann. This implies an acquiescence by Lane to the liquidation of the Lane Processing account. It is notable that, although the record shows a reinstatement of the Lane Processing account could have been performed in minutes, Lane did not attempt to reinstate the account after he was notified of its liquidation at 10:00 a. m. on December 13.

Lane contends that he possessed confidential information that the market would drop during trading on December 13 and that his losses were substantially increased because he was not able to capitalize on this information. Although it is true that the bearish market news (soybean embargo) would have temporarily improved Lane Processing's short position so that Lane Processing could have minimized its loss by one-third if it liquidated at the opportune time, it is equally apparent that if Lane Processing had persisted in its short position during that current marketing year, its losses could have exceeded $8,000,000. This obviously is no business, game or sport for the fainthearted or for those of limited financial resources.

■ Lane Processing also contends that Rule 209 of the Chicago Board of Trade is unconscionable on the basis that one hour is an unreasonably short period of time to require a customer to meet margin calls. Under the facts of this case, this contention is not well taken. The investor or speculator knows that in trading long or short in the commodities market he must maintain a sufficient margin to cover adverse price fluctuations. A position in the market is not a long-term investment to be made and thus thought about at infrequent intervals. Commodities trading requires daily, and at times constant, attention. Lane knew this facet of commodity trading and realized that it was incumbent on him to furnish the required margins as needed according to the terms of his trading contract even without notice and that upon notice he was required to supply the proper margins promptly on demand.

An inter-bank wire transfer of funds can be initiated and verified in a matter of minutes and is commonly used on the Chicago Board of Trade. There is a need for some assurance on the same day a margin deficiency arises that the investor has the financial capabilities as well as the willingness to post the requested sum. An investor who deposits the funds by check may "float" the check for as many as twelve days. Even money sent directly by mail often encounters a delay of two or three days. Such a delay in posting the required funds is antithetical to the needs of commission merchants to maintain properly margined accounts at all times. Merchants have a justified desire to receive funds for margin calls in their offices before trading begins the next day. Rule 209, which is a component of the comprehensive internal regulatory scheme of the Chicago Board of Trade, is a recognition of that desire. This rule complements the liquidation provision in the signature card by affording commission merchants an opportunity to quickly determine whether an investor is going to maintain his margin. If it is determined that the investor does not desire to or is not capable of posting the margin, liquidation may ensue. Due to the availability of wire transfers, one hour is not unreasonable in usual circumstances as a time limitation for giving commission merchants the proper assurance that sufficient financial reserves will be maintained. Therefore, we hold that Rule 209 is not unconscionable in light of the circumstances of this case.

Based upon our disposition of the case, there is no need to discuss Lane Processing's final contention that the District Court erred in not submitting Lane Processing's claim for punitive damages to the jury.

The judgment of the District Court is affirmed.