STOTLER AND COMPANY, et al., Plaintiffs,

v.

Clayton SONNENSCHEIN, Defendant.

No. 87 C 3892.

United States District Court, N.D. Illinois, E.D.

Sept. 6, 1988.

Jeffry M. Henderson, Chicago, Ill., for plaintiffs.

Patrick Duffy, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S.D., Kenneth C. Miller, Corboy & Demetrio, P.C., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Limited partnership Stotler and Company and its partners (collectively "Stotler")

have brought a two-count Amended Complaint (the "Complaint") against Clayton Sonnenschein ("Sonnenschein"), seeking recovery of:

1. Stotler's losses attributable to its having paid $67,187.77 to the clearinghouses of the Chicago Board of Trade and Chicago Mercantile Exchange, to make good the debit balance existing upon Stotler's March 1987 liquidation of Sonnenschein's positions in commodities futures (Count I), and

2. Stotler's damages of $45,000 and punitive damages of $150,000 assertedly arising out of Sonnenschein's alleged fraud in continuing to pursue futures trading through Stotler at a time when Sonnenschein knew he was financially tapped out but failed to disclose that to Stotler (Count II).

Sonnenschein has responded with a Second Amended Answer and Counterclaim, the latter asserting several claims ("conversion" in Count I, "breach of express agreement" in Count II, "breach of implied in fact agreement" in Count III and "breach of agency duty" in Count IV).

Stotler has filed a Fed.R.Civ.P. ("Rule") 56 motion for summary judgment,[1] and the parties have (1) tendered whatever evidentiary submissions they want to offer, (2) filed statements under this District Court's General Rules ("General Rules") 12(e) and 12(f) in that respect and (3) filed memoranda on the schedule established by this Court. For the reasons stated in this memorandum opinion and order, Stotler's motion is granted on Complaint Count I and Sonnenschein's entire Counterclaim, but is denied on Complaint Count II.

### Facts

Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose a trial court draws every

---

1. As the text later reflects, Stotler's motion did not specify in terms whether it spoke to any or all aspects of Sonnenschein's Counterclaim as well as to Stotler's own claims. This opinion has concluded that it did, for reasons that will be set out during the substantive discussion.

reasonable (although not every conceivable) inference in the light most favorable to the nonmovant (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)). General Rules 12(e) and 12(f) have been devised to facilitate that process by requiring both the movant and nonmovant to identify the undisputed and disputed factual issues, thus smoking out at the threshold the existence of any material (that is, outcome-determinative) factual differences.

As already stated, each litigant has submitted its or his General Rule 12(e) or 12(f) filing. Except to the limited extent identified hereafter, Stotler's is in proper form, referring to the evidentiary support for each statement. But though Sonnenschein's statement technically follows the format prescribed by General Rule 12(f), matching Stotler's General Rule 12(e) statement paragraph by paragraph, Sonnenschein does not always comply with the Rule 56(e) requirement that *admissible evidence* be offered in response to a summary judgment motion. This opinion will therefore begin by reflecting the relevant differences between the parties, setting out Stotler's General Rule 12(e) statement (paragraph numbers and all), but (1) omitting the identified evidentiary support wherever Sonnenschein does not dispute the matter and (2) footnoting Sonnenschein's quarrels (where they do exist) with the factual assertions on which Sonnenschein relies for that purpose.

1. On or about June 26, 1986, by virtue of the execution in Chicago by Stotler, defendant Clayton L. Sonnenschein entered into a written agreement with Stotler and Company contemplating transactions in commodity futures contracts for the account and risk of the Defendant.

2. Defendant Clayton L. Sonnenschein was not a novice in trading commodity futures contracts in that he had maintained a trading account for a period of approximately one year during 1979 or 1980. (Deposition transcript of Clayton L. Sonnenschein p. 5 L. 3–14).[2]

3. No changes to the Stotler customer agreement were made by either plaintiff Stotler and Company or defendant Sonnenschein.

4. Prior to March 2, 1987 defendant was in contact with his broker on a daily basis, as it was his custom to either visit the broker's office in person or call on the telephone in order to monitor the status of his account. He often stayed in the broker's office during the entire daily trading period.

5. Defendant had frequent discussions with several individuals regarding the futures market and his account and he relied primarily on this advice and not the broker when making trades for his account. (Sonnenschein dep. p. 21 L. 23—p. 26 L. 3).[3]

6. Defendant had incurred numerous margin requests throughout the time his account was carried by Stotler and Company.

**2.** Sonnenschein admits his prior maintenance of a trading account, but he says (without any evidentiary support) "Whether this made him more than a mere novice in some areas of commodity trading is a genuine issue of material fact." In that respect, Stotler of course seeks to rely on an inference from Sonnenschein's prior trading (see also n. 3), while Sonnenschein points to no counter-inference or any basis for one. All the same, this Court places no reliance on Stotler's "not a novice" characterization—it is certainly a nonmaterial fact in that form.

**3.** Sonnenschein denies this and says he "clearly relied upon his broker to assist in the making of judgments about suitable investments." That may be his claim, but it must be viewed as disingenuous in light of his own deposition testi-

mony about the comparative level of his reliance (Dep. Tr. 24 at 13–22):

Q. So is it fair to say that you were calling a number of people during this period of time seeking their advice or information or input from those persons during the period that account was actively maintained at Stotler?

A. Yes, sir.

Q. Is it also fair to say, Mr. Sonnenschein, that you relied primarily on those persons and on yourself and not Mr. Sterrett [the Stotler broker]?

A. Oh, yes.

Thus Stotler ¶ 5 is a wholly accurate recital of the facts, and Sonnenschein's position is rejected. As will be seen, this issue bears only on one aspect of Sonnenschein's Counterclaim in any event.

7. Defendant had borrowed $48,400 from the Fort Pierre National Bank on or about February 3, 1987, to meet a margin call in his commodity futures account with Stotler.

8. This sum of $48,400 was wire transferred to Stotler and Company on February 4, 1987, to meet a written margin call issued by Stotler and Company on January 30, 1988.

9. On or about February 3, 1987, defendant's banker informed defendant that the bank had reached its limit and could no longer loan money to the defendant except to finance livestock.

10. In early 1987 defendant also obtained approximately $50,000 from the Fort Pierre National Bank to meet a margin call as a result of collateral pledged by a friend of Defendant's.

11. Defendant wire transferred $45,000 to Stotler and Company on February 20, 1987 to meet a written margin call issued by Stotler on February 18, 1987.

12. Defendant provided $54,000 to the Stotler and Company branch office in Pierre, South Dakota on February 25, 1987, to meet a written margin call issued by Stotler on February 23, 1987.

13. Defendant followed the prices of the contracts in his account on a daily basis and, therefore, was aware of any margin shortages when they would occur in his account.[4]

14. On March 6, 1987, Stotler and Company issued and mailed to defendant a written margin request. (Margin requests).[5]

15. Any money used by defendant to meet this margin call would have had to be borrowed. (Sonnenschein dep. p. 76, L. 8–11).[6]

16. At about this time, defendant stated to his broker that defendant needed to talk to defendant's banker in order to meet the margin call but that the banker was out of town.

17. Since the Fort Pierre National Bank could not loan defendant any more funds, defendant was searching for individuals who might be willing to loan him some money.

---

**4.** Though Sonnenschein admits this statement, he "denies that he was aware he had a margin shortage in his account during March of 1987." That is not at all an accurate characterization of his deposition answer to which he refers (Dep. Tr. 73 at 18–19):

    A. I did not believe I had a debit or deficit in my account on March 11, 1987.

As the later text discussion reflects (and as Stotler's assertion confirms), the critical issue is *not* the existence or nonexistence of a debit balance in the account, but rather the existence of a margin shortage and Sonnenschein's knowledge in that respect. On that score Sonnenschein's quoted denial, which goes only to the different question of an actual deficit in the account, cannot be credited (see n. 5).

**5.** Sonnenschein denies both Stotler's mailing and his own receipt of a written margin request. Again Sonnenschein's denial (this time an unsworn one) has to be discredited. As the later text discussion will reflect, his deposition testimony (Dep. 37, 49, 52–53) reflects that during the critical early March period he had to meet with his banker "to meet a margin call." Indeed, a few paragraphs farther on in the text following this footnote (Stotler General Rule 12(e) ¶¶ 16, 18 and 19 and Sonnenschein General Rule 12(f) ¶¶ 16, 18 and 19) Sonnenschein admits precisely that not once but three times. That of course necessarily means he had in fact *received* such a margin call from Stotler. Given

(1) that admission, (2) his acknowledged ongoing monitoring of his own account and (3) the fact that he asserts no basis in his own knowledge to counter the written margin request's having been sent to him at his regular address (as was done on all occasions in the past), he is not entitled to any reasonable inference of either his unawareness of his account's margin shortage or his nonreceipt of a written margin request.

**6.** Although Sonnenschein admits this assertion, he continues that the borrowing would have had to be "against [his] not insubstantial net worth." For that purpose he refers to an unsworn January 21, 1987 financial statement (Stotler Ex. B), with its principal listed values in illiquid form. Thus the statement showed $7,500 "cash in banks" but $97,000 in current liabilities (almost all of it owed to banks), while most of his stated equity was in real estate (farm land and his personal residence). Sonnenschein is not entitled to any inferences in that respect, except those drawn from his own admission that he was unable to obtain any further loans and "was searching for individuals who might be willing to loan him some money" (see Stotler General Rule 12(e) ¶ 17 and Sonnenschein General Rule 12(f) ¶ 17, two paragraphs farther on in the text following this footnote).

18. The reason for defendant's quest for funds was to meet a margin call in his account.

19. On Monday, March 9, defendant once again stated to his broker that defendant needed to meet with defendant's banker in order to obtain funds to meet the margin call.

20. Even with the largest positions ever in his account, defendant spent March 10 and 11 out of town, incommunicado.

21. Defendant did not inform his broker or leave instructions with his secretary as to how he could be reached during this trip.

22. It was defendant's intention that any communication during this period of time would have to be initiated by defendant.

23. Defendant attempted to contact his broker only one time on March 10 at which time the broker was out to lunch.

24. Defendant did not attempt to contact his broker at all on March 11, even though he knew by reading the newspaper that market prices had continued to move against him on March 10, and that his account reflected very substantial losses. (Sonnenschein dep. p. 69 L. 14—p. 70, L. 2).[7]

25. During this period of time, defendant's broker, Alan Sterrett called or attempted to call defendant each and every morning regarding the outstanding margin call. (Deposition transcript of Alan Sterrett p. 52, 1. 6–13 and p. 53, L 15–22).[8]

26. After defendant could not be contacted, Stotler and Company's margin department liquidated the open positions in defendant's account on March 11 for failure to satisfy the margin requirements.

27. The Customer Agreement signed by defendant expressly authorizes Stotler and Company, for its own protection, to liquidate any positions of the Customer for failure to maintain adequate margin.[9]

28. In a conversation with his broker, defendant acknowledged that defendant owed the post-liquidation debit balance in his account. (Sonnenschein dep. p. 87, L. 13—p. 88, L. 8).[10]

---

**7.** Though Sonnenschein admits he did not attempt to reach his broker on March 11, he "denies that he knew by reading the newspaper that market prices had continued to move against him on March 10, and that his account reflected very substantial losses." For that purpose he refers to the two-line answer already quoted in n. 4. But once again that denial related only to his claimed belief that he did not have an account deficit, *not* to any claimed lack of knowledge on his part about the adverse market movement or the losses in his account. In that respect his testimony about how he followed his own account at Dep. 52–53, as well as the already-referred-to meeting he held with his banker "to meet a margin call," belie his remaining hedged denial.

**8.** On this subject Sonnenschein says only that he "lacks sufficient knowledge to admit or deny" Stotler's evidence-supported statement. That kind of assertion (which is of course not itself admissible evidence) has no place at all in response to a summary judgment motion, as contrasted with its being a legitimate form of pleading. Rule 56(e) makes that exceedingly plain. Accordingly Stotler's statement in the text is deemed admitted.

**9.** Sonnenschein admits this statement but goes on to "den[y] the legal significance of any document providing for liquidation without adequate notice." That legal-issue "denial" plays no part in a General Rule 12(f) filing, and the legal question is discussed later in the text.

**10.** Sonnenschein denies any such acknowledgement, "admitting only that he consulted his banker about funds which might be used to pay a debit balance should it prove that the amount was actually owed. [Sonnenschein] denies owing this amount." That must be viewed as an extraordinary stretch of the facts in light of his testimony at Dep. 87–88:

Q. And can you state what you told Mr. Sterrett and what Mr. Sterrett told you during that discussion?

A. I think Mr. Sterrett told me that I had a debit or that I owed Stotler and Company and I don't know the amount, sixty some thousand dollars, I believe. I am not positive what my response was. It was something to the effect that "I am still talking to my banker."

Q. About—still talking to your banker about obtaining the funds?

A. Yeah.

Q. Funds to pay the debit balance?

A. Yes.

Q. And you recall referring to your banker during that conversation because Mr. Sterrett had asked you when you were going to pay it; isn't that correct?

A. Probably, yes.

Q. And in response—I'm sorry, strike that. During that meeting with Mr. Sterrett, you

29. Defendant acknowledged owing the ending debit balance in his account in a conversation with an attorney for Stotler and Company. (Sonnenschein dep. p. 88, L. 9–23).[11]

### Complaint Count I: Breach of Contract

Under the operative facts of this case Sonnenschein, a regular and active participant in the legalized gambling known as commodities futures trading, failed to supply the required margin when sharp market fluctuations created a deterioration—indeed a major debit balance—in his account with Stotler. That was a direct breach of the Customer's Agreement (the "Agreement") between them. Agreement ¶ 9 gave Stotler authority to liquidate Sonnenschein's account—to close him out—with or without notice "[w]henever Stotler deems it necessary or advisable for Stotler's protection. . . ."

There is no question that the just-quoted precondition to liquidation was met, and it was met by more than reasonable apprehension on Stotler's part. On three prior occasions during the preceding 40 days Sonnenschein had responded to margin requests with wire transfers of funds—a total of more than $147,000. But when Sonnenschein's early March 1987 position had become the largest ever in his account and when that position again became undermargined, Stotler's margin request went unanswered. Instead Sonnenschein dropped out of sight: He left town, went incommunicado, was totally unreachable and had left no instructions as to how he could be reached.

■ That left Stotler no alternative. It had no obligation to ride matters out, to gamble along with Sonnenschein in a high-risk situation. When Sonnenschein made money in his trading, he did not of course share his profits with Stotler. When he lost, Stotler could scarcely be expected to bear any part of his losses. It had liability to the exchange clearinghouses on the Sonnenschein account, and it had to satisfy that liability. It was wholly within its rights in implementing its commercially reasonable liquidation provisions in its Agreement with Sonnenschein (see, e.g., *Geldermann & Co. v. Lane Processing, Inc.*, 527 F.2d 571, 576–77, 578 (8th Cir. 1975); *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 990–91 (S.D.N.Y.1984)).

That identical conclusion is independently reachable under the applicable rules of the two exchanges (Chicago Board of Trade ["CBT"] and Chicago Mercantile Exchange ["Merc"]), which were made part of Stotler's obligations under Agreement ¶ 1. CBT Rule 430.00 authorizes the closing out of a defaulting (that is, nondepositing) customer's account "within a reasonable time after demand, and, in the absence of unusual circumstances, one hour shall be deemed a reasonable time" (Merc Rule 827D is to the same effect). Each exchange (CBT Rule 430.00 and Merc Rule 827E) provides that if the exchange member (here Stotler) is unable to effect personal contact with the customer, a written demand left at the customer's place of business "shall be deemed sufficient." In this instance Stotler mailed the margin call to Sonnenschein as in the past, waited fully five days (during that period Sonnenschein had *made* himself inaccessible and unreachable), and only then closed him out.

---

never told Mr. Sterrett that you wouldn't pay the debit; isn't that correct?

A. That's correct.

11. Here Sonnenschein repeats his denial of any acknowledgement and his version of his statement just discussed in n. 10. In this respect the evidence of his own testimony is again more revealing than any claimed denial or alternative version (Dep. 88 immediately following the portion quoted in n. 10):

Q. Do you recall speaking with myself in March of 1987 about your account?

A. I remember your name and I remember having spoken to you, yes.

Q. Isn't it true that during our conversation that you stated that your banker had been out of town for a period of time, that he was due back and that you would speak with him regarding borrowing more money so that the debit balance could be paid?

A. I believe so.

Q. And was that a true statement?

A. Yes, sir.

Q. At that time?

A. Yes, sir.

It is scarcely necessary under such circumstances to justify Stotler's contract-conforming conduct. What common sense would dictate is supported by the authorities. This is at least as strong a case for the commodities house as *Geldermann v. Lane* and as *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Brooks*, 548 F.2d 615 (5th Cir.) (per curiam), *cert. denied*, 434 U.S. 855, 98 S.Ct. 173, 54 L.Ed.2d 126 (1977).

Sonnenschein really offers nothing in response except another effort to drop out of sight—this time in the figurative sense—behind the summary judgment rule that inferences are to be drawn in his favor. Because courts cannot properly make credibility determinations on a Rule 56 motion, there are times when even what seems obvious perjury is enough to create a mutual factual dispute and thus to escape summary judgment (see, e.g., *G. Bauknecht GmbH v. Electronic Relays, Inc.*, 569 F.Supp. 404, 409–10 (N.D.Ill.1983)). But that will not work for Sonnenschein here.

For example, Sonnenschein urges he did not receive a margin call in March 1987 from Stotler and did not then believe his account showed a debit balance. But the former misstates the evidence (see n. 5 and Sonnenschein's own admissions in his General Rule 12(f) statement, as referred to in that footnote), and the latter (even if it were to be credited, a doubtful proposition) is not really the issue (see n. 4). What Sonnenschein's deposition answers really reflect on both subjects is a kind of hedging (pun intended) set of conclusory responses at odds with his own testimony on the *facts* that bear directly on those conclusions. Sonnenschein's responsive memorandum relies on this deposition testimony at pages 73 and 74:

Q. So it's your testimony that based on the deposits you made in February of 1987, despite the fact that the market was moving against you during that buyer period, despite the fact that you knew that you had open trade debit equity in your account, you believed that you had excess money in your account; is that your testimony?

A. I did not believe I had a debit or deficit in my account on March 11, 1987.

\* \* \* \* \* \*

Q. Mr. Sonnenschein, do you ever recall receiving a telephone call or a message by a person named Mark Martin?

A. The name doesn't ring a bell.

Q. Do you ever recall being contacted by anyone directly from Stotler and Company before liquidations of these positions occurred?

A. No. Not—not regarding the liquidation of the position. I talked to somebody from Stotler earlier on regarding some form they wanted me to fill out and return to them, but that was three or four months prior to this.

But those generalized conclusions, even with reasonable favorable inferences, are frankly belied by Sonnenschein's admission on the *factual* matters that control. What he testified to right in between the two excerpts quoted above (at the place indicated by the asterisks) was this (Dep. 73–74):

Q. Did you believe that you had excess money in your account to market your positions? That's just what you just said a minute ago.

A. I am going to ask you to read my response back to that, that he says I—

(at this time, the answer was read back by the court reporter.)

A. I don't know if I meant I had excess moneys but—I didn't know if I had excess moneys, but I don't believe that I felt it was that far out of line.

Q. On what did you base your belief that you did not think that was not far out of line?

A. I did not have a margin request.

More importantly, the issue as to Stotler's right to close out Sonnenschein's account is not one of a debit balance in his account as such, but rather the lack of the required margin funds in the account. On that score the answer, from Sonnenschein's own testimony, is very different (Dep. 37, 49, 52–53):

Q. And why would you have told Mr. Sterrett that you needed to talk to your banker?

A. I presume to borrow some money.

Q. And why would you need to borrow some money?

A. Depends on what I was doing. I would assume that it would be to meet a margin call.

\* \* \* \* \* \*

Q. So you agree that you could have told Mr. Sterrett on that day that you had to meet with your banker in order to obtain funds to meet the margin call?

A. I would have to meet with my banker to meet a margin call, yes.

\* \* \* \* \* \*

Q. And isn't it correct that when you had open positions on in your account, Mr. Sterrett was the person who would tell you whether or not those positions had to be margined or not margined?

A. Not always.

Q. If Mr. Sterrett didn't tell you, who would tell you?

A. Nobody. Or I would figure it out.

Q. How would you figure it out?

A. I knew roughly what the initial margin was. And what the movement—what the difference between the current price was and my position was.

Q. If you knew the difference between the current price and your position, is it fair to say that you were following the prices?

A. Oh, sure.

Q. And how did you follow the prices?

A. I would be in Mr. Sterrett's office, view them on his computer screen. If I wasn't in the office, I would listen to the radio. I would call or—or I would call Mr. Sterrett. Or he would call me.

But it is really not necessary to rehearse the evidence in such detail. As nn. 4 and 5 reflect, Sonnenschein has really *admitted* the material facts in his General Rule 12(f) statement—except to the extent he has advanced unsupported (or unsupportable) denials.

In similar manner, Sonnenschein's Mem. 5 misleadingly converts the following testimony by Sonnenschein's secretary Phyllis Douglas into a *denial* that any phone calls had been received from Stotler (Douglas Dep. 6, 7):

Q. Do you remember him making any telephone calls to your office?

A. In what period of time?

Q. During the period beginning March 1, 1987 through March 15, 1987?

A. No, I don't.

\* \* \* \* \* \*

Q. Okay. And do you recall receiving messages from Mr. Sterrett on those two days?

A. No, I don't.

Q. You don't. Did you always record on your message pad calls that you received from Mr. Sterrett for Mr. Sonnenschein? Or were there times when you simply made a mental note of its and you spoke with Mr. Sonnenschein, you relayed the message to him?

A. Sometimes if he weren't—if he was right there, I would just verbally tell him. Otherwise, I try to write messages down.

That combined failure of recollection and the effort to "try to write messages down" becomes converted, by sleight of hand, into this argument (Sonnenschein Mem. 5):

Clayton Sonnenschein's personal secretary, however, denies that any phone calls were received from Stotler and Company during March of 1987, and no written phone records support the plaintiff's registered representative's contention that he called and left messages at the Defendant's office, despite the fact that written phone records were kept by the Defendant Clayton Sonnenschein's office at all times during March of 1987.

What all this means is that Sonnenschein has not succeeded in identifying any outcome-determinative fact as to which a genuine dispute exists. Stotler's General Rule 12(e) statement, considered in light of the legal principles described in this section of this opinion, has provided everything in the way of proof needed to support Stotler's Count I claim—and nothing in Sonnen-

schein's General Rule 12(f) statement derogates from that proof in any material respect (indeed, the bulk of that General Rule 12(f) statement is totally confirmatory of Stotler's position). Nor is this Court bound by the self-characterizations in Sonnenschein's legal memorandum, which are so seriously at odds with the facts.

Stotler is entitled to a judgment as a matter of law for its losses sustained in liquidating Sonnenschein's account. Because the Complaint carried interest only up to a much earlier date than the present, however, Stotler will be required to provide the definitive figure for inclusion in that judgment.

### Complaint Count II: Fraud

Stotler also claims it is entitled to summary judgment on its Count II claim for fraud, on which it seeks $45,000 in compensatory and $150,000 in punitive damages. Neither party has done an adequate job on that facet of Stotler's summary judgment motion, though as movant Stotler must ultimately suffer from its inadequacy (while Sonnenschein thus escapes the consequences of his own shortcomings).

On the substantive questions posed by Count II, neither side really addresses all the issues (or even many of them). Illinois standards of fraud form the rule of decision in this diversity case, and those standards have been compactly stated in *Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980) (citations omitted):

> (1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.... Furthermore, the reliance by the other

party must be justified, *i.e.*, he must have had a right to rely.

In the context of nondisclosure—which in the related securities-fraud field are labeled material omissions, as contrasted with the usual situation of fraudulent misrepresentation—those standards are modified by requiring that the claimed "concealment must be shown to have been done with the intention to deceive under circumstances creating an opportunity and a duty to speak" (*Dendrinos v. Dendrinos*, 58 Ill. App.3d 639, 642, 16 Ill.Dec. 241, 243, 374 N.E.2d 1016, 1018 (1st Dist.1978) (citation omitted)).

Here Sonnenschein contends Stotler has not shown, beyond material factual dispute, the key claimed nondisclosure: Sonnenschein's known inability, when he placed the March 1987 orders for April 1987 cattle and March 1987 oats, to obtain further financing if it were to become necessary to meet future margin calls or even account deficits. But Sonnenschein is dead wrong on that, and he has to know it. His own testimony demonstrates that he had run out of available borrowing sources and was beating the bushes (without success) for more. Nothing in the record entitles Sonnenschein to favorable inferences to undercut that showing.[12] Accordingly there is no question as to the essential element of nondisclosure.

But on the other hand, Stotler has offered nothing but its own unsupported assertions as to the *materiality* of that nondisclosure or as to Stotler's detrimental *reliance*. Those factors necessarily depend on the contention that if Stotler had known Sonnenschein's financial condition it would not have filled his March orders. Yet no evidence at all on that score is identified in Stotler's General Rule 12(e) statement. Nor has Stotler addressed the legal question of Sonnenschein's *duty* to speak—to disclose the fact he was cash-

---

**12.** This conclusion takes into account Sonnenschein's asserted net worth from his own financial statement, in which he ascribes substantial values to illiquid real estate holdings (see n. 6 and Stotler Ex. B, the financial statement itself). If those assets had in fact been capable of generating a source of borrowed funds, there was nothing to prevent Sonnenschein from presenting evidence to that effect. But the uncontradicted record from Sonnenschein's own testimony is that he had been unable to raise more borrowed money. Hence no relevant inference in Sonnenschein's favor flows from the financial statement alone.

poor though perhaps asset-rich. Finally, Stotler has done nothing to flesh out the damage claim represented by its Count II ad damnum:

1. Its compensatory damage claim appears to be totally subsumed within its Count I damage claim, because the March 1987 orders that were the subject of the claimed nondisclosure ended up as part of the liquidation closeout of Sonnenschein's account.

2. No handle of any kind is furnished for quantifying the punitive damages claim.

This Court sees no justification for the assertion of a summary judgment motion on Count II. It is, in all candor, a real imposition for a litigant to require a court opinion to be written where counsel have not done their job at all. Though Sonnenschein's counsel has displayed his own deficiencies here as elsewhere,[13] Stotler's burden on its own Rule 56 motion makes it the loser here.[14]

### Sonnenschein's Counterclaim

Sonnenschein's Second Amended Answer is coupled with a four-count Counterclaim. For the most part the Counterclaim is a mirror image of Stotler's Count I claim: Evidence that has proved Complaint Count I also directly disproves part or all of the Counterclaim causes of action. And even to the extent that the overlap is not total,

analysis discloses that Stotler's already-demonstrated successful proof on Complaint Count I requires the dismissal of the Counterclaim counts because of the total absence of Sonnenschein's proof as to the required elements that make up his own claims.

Stotler's current motion was labeled one for summary judgment, without any stated limitation. It is clear that Stotler's counsel viewed the motion as fully dispositive of this litigation (though mistakenly so as to the Complaint Count II fraud claim, as we have seen). Yet without warrant Sonnenschein's response asserts in its introduction (Mem. 1–2):

Plaintiff Stotler and Company has not moved for summary judgment on Defendant Clayton Sonnenschein's theory that Plaintiff Stotler and Company owed Defendant Sonnenschein a duty to inform him of the enormous risk posed by entering the delivery month, a duty admitted by Stotler employees and outlined in Stotler's Compliance Manual. For that reason, this theory of recovery will not be defended in this memorandum because it has apparently been conceded by Plaintiff.

It requires only a brief review of Sonnenschein's entire Counterclaim to conclude that such a self-serving reading—in addition to being unjustified[15]—will not work to stave off defeat for Sonnenschein.

---

**13.** Apart from Sonnenschein's already-discussed untenable argument about the *fact* of his nondisclosure on the unavailability-of-financing issue (Sonnenschein Mem. 7), all Sonnenschein's lawyer argues is that "resolution of questions of intent by summary judgment is strongly disfavored" (*id.* 8). True enough, but so what? Summary judgment *is* unquestionably available even where intent is in issue, with courts required to apply the same rules that govern all summary judgment motions. It is simply that the nonmovant's entitlement to favorable inferences, coupled with the inherently subjective nature of intent, makes the movant's task harder. Thus the arguments Sonnenschein's counsel chooses to advance do not suffice to avert summary judgment. Yet counsel does not even address the dispositive matters identified in this opinion.

**14.** This discussion has not sought to be definitive, so Stotler's lawyer should not mistake it as

providing a roadmap for a successful judgment (either under Rule 56 or at trial). It is counsel's responsibility, not this Court's, to determine in the first instance what is needed to prevail on Stotler's fraud claim.

**15.** As stated in n. 3, Sonnenschein's own testimony establishes that he looked primarily to the advice of others and *not* to Stotler in his trading transactions. As n. 3 reflects, Stotler's General Rule 12(e) Statement ¶ 5 puts Sonnenschein's testimony accurately:

5. Defendant had frequent discussions with several individuals regarding the futures market and his account and he relied primarily on this advice and not the broker when making trades for his account. What is important for current purposes is that this factual assertion really does not bear directly on Stotler's own claim, for which the issue of Sonnenschein's reliance is not at all material. Instead the quoted paragraph is obviously a

## Count I

This claim sounds in conversion, based on the allegedly wrongful liquidation of Sonnenschein's account. But simply stating the claim demonstrates it is automatically rejected by Stotler's summary judgment success on its Complaint Count I, which upheld the liquidation as proper.

## Count II

This claim asserts breach of an agreement on Stotler's part to give Sonnenschein notice and an opportunity to meet any margin requirement. Again the discussion and conclusion as to Stotler's Complaint Count I has shown that this claim by Sonnenschein must be and is dismissed on the merits.

## Count III

This count alleges two *implied* agreements between Stotler and Sonnenschein. One echoes the express agreement to the same effect as stated in Counterclaim Count II, while the other is labeled "an implied agreement and understanding between the parties that [Sonnenschein] would be notified and advised of the substantial risk of carrying long positions into the delivery month and of assuming additional long positions during the delivery month."

As for the first of those, the same principle already discussed as to Counterclaim Count II applies to compel rejection of that claim. As for the second, Sonnenschein has offered no evidence at all from which any such "implied agreement and understanding" could be derived. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53 provides the teaching that spells defeat for Sonnenschein:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Counterclaim Count III is also dismissed on the merits.

## Count IV

This claim asserts breach of an alleged agency duty on Stotler's part "to use reasonable efforts to give [Sonnenschein] information relevant to his account of which [Stotler] had knowledge." Counterclaim Count IV then repeats the same two matters as Counterclaim Count III as subjects that Stotler allegedly knew or should have known Sonnenschein wanted to be advised about.

By definition, then, Counterclaim Count IV suffers the same fate as Counterclaim Count III—dismissal on the merits—and for exactly the same reasons. Moreover, Stotler R. Mem. 1 states an independent reason for rejection of the second facet of both Counterclaim Counts III and IV:

As an afterthought, defendant Clayton Sonnenschein has decided to include one sentence in his Amended Counterclaim addressing the issue of plaintiff Stotler and Company's alleged duty to inform him of the risks posed in holding positions during the delivery month. This issue was not raised in plaintiff's motion

direct counter to Sonnenschein's Counterclaim Counts III and IV, each of which is based in part on the claim referred to in the language just quoted in the text from Sonnenschein's Memorandum. Thus Stotler's very inclusion of the matter as one of the "uncontested facts" called for by General Rule 12(e)'s requirement for "a statement of the material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law" is a direct refutation of any argument by Sonnenschein that Stotler had "conceded" the issue. After all, the subject was "material," and it could lead to judgment for Stotler, *only* on the duty-to-inform issue in Sonnenschein's Counterclaim, not on Stotler's liquidation or fraud claims.

and memorandum in support thereof because it is irrelevant. The liquidation and subsequent debit balance in defendant's account was the result of a drastic price move against his position. The settlement price for March 87 oats on March 2, 1987 was 1.53-¼, (Exhibit A—March 2 Commodity Statement) which was already below the prices at which defendant had put on the positions in his account. Within the next eight days this oats price deteriorated even further closing at a settlement price of 1.26-½ on March 10, 1987. (Exhibit B—March 10 Commodity Statement) It is this 17.5% drop in the price of defendant's very substantial oats position that resulted in his debit balance.

*   *   *   *   *   *

In summary, none of the theories on which Sonnenschein has countersued survives Stotler's summary judgment motion. No genuine issues of material fact stand in the way of dismissal of the entire Counterclaim on the merits.

### Conclusion

There is no genuine dispute as to any material fact, and Stotler is entitled to a judgment as a matter of law, on Count I of the Complaint and on all four counts in Sonnenschein's Counterclaim (which are dismissed on the merits). Stotler's motion for summary judgment on Complaint Count II, however, is wanting in several respects and must be denied.

That disposition of the current motion leaves several things to be done:

1. Stotler must provide an updated number for the interest component of its Complaint Count I judgment, so that the proper judgment order can be entered. That should be done on or before September 16, 1988.

2. If Stotler hopes to make its partial summary judgment capable of current enforcement, it must address the Rule 54(b) problem. That subject requires analysis (see, e.g., *Automatic Liquid Packaging, Inc. v. Dominik*, 852 F.2d 1036, 1037–38 (7th Cir.1988)), and both Stotler and Sonnenschein are directed to address the relevant issues by memoranda simultaneously filed on or before September 16, 1988.

3. Because the claim in Complaint Count II survives this opinion, future procedures need to be discussed.

This action is set for a status hearing at 9 a.m. September 26, 1988 to deal with all these matters.