**CAPITAL OPTIONS INVESTMENTS, INCORPORATED, a Delaware corporation, Plaintiff–Appellant,**

v.

**GOLDBERG BROTHERS COMMODITIES, INCORPORATED and Linnco Futures, Incorporated, Defendants–Appellees.**

No. 90–3594.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 29, 1992.

Decided March 19, 1992.

Richard P. Campbell, Anthony S. DiVincenzo (argued), Campbell & DiVincenzo, Chicago, Ill., for plaintiff-appellant.

Walter C. Greenough, Paul A. Scrudato, Schiff, Hardin & Waite, Chicago, Ill., for Goldberg Bros. Commodities, Inc.

Pamela R. Hanebutt, William J. Nissen (argued), Joseph H. Harrison, Brian J. Sullivan, Sidley & Austin, Chicago, Ill., for Linnco Futures, Inc.

Before FLAUM and KANNE, Circuit Judges, and PELL, Senior Circuit Judge.

KANNE, Circuit Judge.

Capital Options Investments ("Capital") brought this diversity suit, 28 U.S.C. § 1332, alleging breach of contract and tortious interference with its prospective economic advantage by Goldberg Brothers Commodities, Inc. ("Goldberg") and Linnco Futures, Inc. ("Linnco"). The district court granted summary judgment in favor of the defendants. We affirm.

## BACKGROUND

During the period relevant to this suit, Capital was an introducing broker for commodity options investments sold to the retail public. Goldberg, a futures commission merchant, had a contractual agreement with Linnco, an introducing broker, whereby Goldberg cleared trades for Linnco's customers and Linnco administered the clearing arrangement for Goldberg with respect to these customers and guaranteed the payment of any unpaid losses in these customer accounts. In turn, Goldberg guaranteed the payment of any such losses to the applicable commodity exchange. Under this arrangement, Goldberg and Linnco together acted as clearing broker for the accounts of Capital's customers. As such, they received customer orders from Capital, arranged for the execution of trades on the exchange floors, processed the trades, issued account statements, and held customer funds in segregated accounts. Both the clearing agreement between Goldberg and Capital and the letter agreement between Capital and Linnco were expressly subject to the Goldberg Customer Agreement ("Agreement").[1]

---

1. The Agreement provided, in relevant part:
   9. Margin Requirements. Customer at all times will maintain such margins or collateral for Customer's accounts *as requested from time to time by Broker in its sole discretion* (which requests may be greater than exchange and clearing house requirements).... Broker's failure at any time to call for a deposit of margin shall not constitute a waiver of Broker's rights to do so at any time thereafter, nor shall it create any liability of Broker to Customer.
   10. Liquidation of Positions. In the event that (a) Customer shall fail timely to deposit

Capital's customers traded primarily on margin, that is to say, they only paid a fraction of the actual cost on a trade in advance. Under the terms of the Agreement, Goldberg and Linnco had sole discretion to determine the amount of margin and authority to liquidate the customers' accounts if the requested margin was not met. Pursuant to its clearing agreement with Goldberg, Capital was required to communicate the margin requests to its customers and to use its best efforts to assure payment of the margin requirements.

At the time in question, most of Capital's customers held naked short gold options[2] positions in their accounts in combinations known as "strangles."[3] Gold strangles can result in a profit if the price of gold is traded in the range established by the options but can result in a loss if the price of gold goes either above or below the strangle range. Therefore, while strangle positions can be profitable in calm markets, they are much riskier in volatile markets. Capital's customers had opened these positions prior to the stock market crash of October 19, 1987, and they were not due to expire until late in 1987 and early in 1988.

On the day of the crash, Linnco increased the margins for Capital's customers from $1300 to $2600 with five days to meet the margin. On November 4, 1987, Linnco informed Capital that it wished to terminate their relationship and refused Capital's request to employ trading strategies to avoid termination. The next day, Linnco advised Capital that the margin requirements on the naked short gold options positions held by Capital's customers were being raised to $15,000 per option and gave Capital's customers one hour to satisfy the increased margin requirements. None of Capital's customers satisfied the increased margin requirements, and consequently their positions were closed out. The margin call of November 5, 1987 is the subject of this law suit.

The district court determined that Capital had not met the legal standard for bad faith and that Goldberg and Linnco acted within their contractual rights in increasing the margin requirement, in providing one hour in which to meet the margin requirement, and in liquidating the accounts for failure to meet the margin call. The district court further concluded that Capital failed to establish actual malice for the tortious interference claim.

## ANALYSIS

Our review of a district court's grant of summary judgment is *de novo*. *Renovitch v. Kaufman*, 905 F.2d 1040, 1044 (7th Cir. 1990). Summary judgment is appropriate where there is no genuine issue as to any material fact and where the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing the record, we accept all facts and inferences in the light most favorable to the party that opposes the motion. *Stokes v. City of Madison*, 930 F.2d 1163, 1168 (7th Cir. 1991). "When a contract is the subject of a summary judgment motion, 'the appropriateness of summary judgment will turn on the clarity of the contract terms under scrutiny.'" *Old Republic Ins. Co. v. Federal Crop Ins. Corp.*, 947 F.2d 269, 274 (7th Cir.1991) (quoting *International Surplus Lines Ins. Co. v. Fireman's Fund*

---

or maintain margin or any other amount hereunder; ... or (f) *at any time Broker deems it necessary for its protection for any reason whatsoever, Broker may, in the manner it deems appropriate in order to prevent or minimize loss,* close out Customer's open positions in whole or in part, sell any or all of Customer's property held by Broker, buy any securities, Commodity Contracts, or other property for Customer's account, and cancel any outstanding orders and commitments made by Broker on behalf of Customer. Such sale, purchase or cancellation may be made *at Broker's discretion without advertising the same and without notice to Customer or his* *personal representatives and without prior tender, demand for margin or payment, or call of any kind upon Customer.* (emphasis added).

2. A naked short option occurs when an option is sold by a customer who does not own such a position.

3. A strangle is a trading strategy in which a customer *sells* a put option (the right to sell at one price), while at the same time selling a call option (the right to buy at a different price).

*Ins. Co.*, No. 88–C320, 1991 WL 74582, at *3, 1991 U.S. Dist. LEXIS 6139, at *7 (N.D.Ill. May 4, 1991)).

The parties do not dispute that Illinois law governs this diversity suit. Under Illinois law, a covenant of good faith and fair dealing is implied in every contract. *LaScola v. US Sprint Communications*, 946 F.2d 559, 565 (7th Cir.1991). Contractual discretion must be exercised reasonably and not arbitrarily or capriciously. *Greer Properties, Inc. v. LaSalle Nat'l Bank*, 874 F.2d 457, 460 (7th Cir. 1989). The term "good faith" refers to "an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990) (regarding equitable subordination of priority claims in bankruptcy). As applied to the commodities area, a margin call is not made in good faith when it is "contrived ... to penalize [the customer] for some reason *unrelated* to [the broker's] business." *Baker v. Edward D. Jones & Co.*, Comm.Fut.L.Rep. (CCH) ¶ 21,-167, at 24,772 n. 10 (CFTC 1981) (describing the legal standard for bad faith as it relates to margin calls) (emphasis added).

Proof of tortious interference with prospective economic advantage requires, among other things, a showing that the tortfeasor acted with actual malice. *Langer v. Becker*, 176 Ill.App.3d 745, 751, 126 Ill.Dec. 203, 207, 531 N.E.2d 830, 834 (1st Dist.1988). "To demonstrate malice, ... the evidence must establish that the individual acted with a desire to harm which was unrelated to the interest he was presumably seeking to protect by bringing about the contract breach." *Id.*

On appeal, Capital asserts that Goldberg and Linnco breached their respective contracts with Capital and tortiously interfered with Capital's economic advantage by: (1) increasing the margin requirements only for Capital's customers and not for the customers of any other introducing broker doing business with Goldberg and Linnco; (2) giving Capital's customers just one hour to meet the margin call in contravention of their customary policy of allowing customers to cover them the following day; and (3) liquidating those accounts when the margins were not met. Capital concedes that the Agreement gave Goldberg and Linnco discretion to increase the margin requirements. However, Capital argues that the contractual power to increase margins was not unlimited and that the focus of the inquiry should be whether Goldberg and Linnco exercised their discretion reasonably. *Rao v. Rao*, 718 F.2d 219, 223 (7th Cir.1983). Capital contends that the district court erroneously ruled on issues of good faith, reasonableness, and credibility. *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985) (summary judgment is inappropriate for determination of claims in which issues of good faith and intent dominate). Capital argues that it presented sufficient specific evidence to raise a genuine issue of material fact regarding the reasonableness of Goldberg's and Linnco's actions from which bad faith could be inferred: (1) the margin increase on one-hour notice applied only to plaintiff's customers, even though other accounts also contained options positions posing unlimited risk; (2) the margin increase far exceeded previous margin increases imposed under much more volatile market conditions; (3) there were no adverse market movements on the day defendants increased margins; (4) defendants offered a different justification on the day of the margin increase than offered in support of the motion for summary judgment; and (5) defendants refused to allow plaintiff to take steps short of liquidation to lessen the perceived risks.

Goldberg and Linnco counter that they used their contractual power to increase the margin requirements because they no longer wished to bear the high risks associated with the strangles without additional margin. They perceived the market to be more volatile and uncertain in the aftermath of the crash and thus believed that Capital's business held more risks than the businesses of their other customers. They argue that they were entitled to judgment as a matter of law because Capital's evi-

dence did not create a genuine issue of material fact regarding unreasonable conduct, bad faith, or actual malice.

■ One-hour notice to post additional margin, despite previous practices, is reasonable where a contract specifically provides for margin calls on options at any time and without notice. *Prudential–Bache Sec., Inc. v. Stricklin*, 890 F.2d 704, 706–07 (4th Cir.1989) (involving increased margin call and liquidation of the margin account on the put options market during the period of the 1987 stock market crash). In *Geldermann & Co. v. Lane Processing, Inc.*, 527 F.2d 571 (8th Cir.1975), the issue was whether a Chicago Board of Trade rule was unconscionable and thus unenforceable. The rule provided that deposits for increased margins must be made "within a reasonable time after demand, and, in the absence of unusual circumstances, one hour shall be deemed a reasonable time." *Id.* at 575. In holding that, given the availability of wire transfers, the provision was not unreasonable under the circumstances of that case, the Eighth Circuit noted that "[c]ommodities trading requires daily, and at times constant, attention" and that the sophisticated broker knows that he must maintain an adequate margin to cover price fluctuations. *Id.* at 578. In the instant case, the Agreement authorized Goldberg and Linnco to make margin calls for any reason based on their own good faith business judgment, *Baker*, Comm.Fut.L.Rep. (CCH) at 24,771, and to cancel or sell a customer's positions without any notice to the customer and without any prior tender or demand for margin or payment. *See, e.g., Omnivest, Inc. v. Elders Futures, Inc.*, 157 A.D.2d 528, 550 N.Y.S.2d 6, 8 (1st Dept.1990) (upholding clearing broker's unfettered discretion under contract to increase margins and close out accounts where margins were not met during the stock market crash). Goldberg and Linnco assert that they chose to increase the margin requirements of only Capital's customers because Capital's customers had a heavy concentration of these positions, whereas no other introducing broker doing business with Goldberg and Linnco had any significant number of naked short options

in its customers' accounts. Moreover, it is undisputed that positions other than naked short options held by Capital's customers were allowed to remain open. Capital has not shown that Goldberg and Linnco exercised their contractual discretion to increase the margins of only Capital's customers in bad faith.

Capital also argues that the fact that Goldberg and Linnco acted contrary to their customary practices is evidence of bad faith. However, the terms of the Agreement specified that a failure to call for margin did not waive their right to do so at any time in the future. The Agreement further provided that they could close out a customer's position in whole or in part whenever they deemed it necessary for their protection "for any reason whatsoever ... to prevent or minimize loss." In any event, without evidence to the contrary, it cannot be said that $15,000 per option was unreasonable in light of the fact that it represented less than one-third the value of the gold controlled by the contracts, leaving Goldberg and Linnco at risk on the other two-thirds.

Capital's argument that the claim of undue risk on Capital's customers' accounts was unsupported by the prevailing market conditions and thus indicative of bad faith is also unavailing. Capital argues that *Prudential–Bache* is distinguishable because there the margin calls were increased during the crash, whereas here, as it turned out, the market was calm on the day of the margin calls. Margins are accorded a special status in the regulatory scheme of the Commodity Exchange Act so that futures commission agents are able to assure their own financial integrity, which, in turn, contributes to the financial integrity of the entire marketplace. *Baker*, Comm.Fut.L.Rep. (CCH) at 24,772. The financial integrity and the efficiency of the market require brokers to be able to anticipate the possibility of future volatility and to exercise their discretion as a matter of business judgment to raise margins accordingly without the fear of subsequent claims of bad faith if the market conditions did not change as predicted. *Id.; Kham*, 908 F.2d

at 1357 ("[parties] that have negotiated contracts are entitled to enforce them to the letter ... without being mulcted for lack of 'good faith' "). Goldberg and Linnco made a business judgment that an increase in the margin was necessary. Courts are not equipped to second-guess the business judgments of professional traders and brokers when it comes to risk assessments.

Capital contends that Goldberg and Linnco put their credibility into question because, on the day of the margin call, they stated that their reason for the increase was anticipation of a *decrease* in the price of gold, but when moving for summary judgment their justification instead was the unlimited risk of an *increase* in gold prices. Both reasons relate to perceived risk, and the change in reason does not bear on any material issue in dispute to prevent summary judgment. While it is true that summary judgment is inappropriate where an issue requires weighing the credibility of witnesses, *see United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1265–66 (7th Cir.1990), that is not the case here. The change in reason does not go to credibility, but rather to the weight of the evidence submitted by Goldberg and Linnco. *Kissell v. Breskow*, 579 F.2d 425, 428 (7th Cir.1978) (question of credibility does not of itself create a triable issue of fact); *accord Matter of Guglielmo*, 897 F.2d 58, 63 (2d Cir.1990). The two reasons are not inconsistent since the concern with market volatility up *or* down would be sufficient justification for a margin call. The contract allowed for an increase in margin for any reason at any time. The material issue in dispute is whether the discretion to increase the margin was exercised in bad faith. Capital has

not shown that a change in reason for the perceived risk behind the margin call creates an inference of bad faith.

Finally, the district court rejected Capital's argument that the failure to allow Capital to use strategies to reduce the risk involved with the naked short options called into question the legitimacy of Goldberg's and Linnco's motives. The district court found that Capital was an experienced and sophisticated broker who understood the provisions of the agreements with Goldberg and Linnco. It further found that Capital's "less drastic alternative" standard was both unsupported by legal authority[4] and unworkable because the risks involved with naked short options positions are substantial. Imposing a "less drastic alternative" standard on the contractual authority of brokers would strip them of their right to raise margins when they perceived a potentially volatile market. In any event, the doctrine of good faith cannot be used to alter an allocation of the risk that the parties had agreed upon. *Cf. First Nat'l Bank of Chicago v. Atlantic Tele–Network Co.*, 946 F.2d 516, 521 (7th Cir.1991).

## CONCLUSION

Capital has not produced evidence to raise a genuine issue of material fact whether Goldberg and Linnco breached a legal duty owed to Capital either in contract or tort by exercising their contractual rights unreasonably. In addition, Capital has not met the legal standard for bad faith by showing that Goldberg and Linnco made the decision to increase margins for reasons unrelated to their business or to penalize Capital. *See Baker*, Comm. Fut.L.Rep. (CCH) at 24,772 n. 10. In fail-

4. Capital presented as legal authority an administrative case in which one of Capital's customers initiated a reparations suit against Capital, Goldberg, and Linnco based on the margin calls at issue here. *See Kimmel v. Capital Options*, CFTC Docket 88–R227 (12/2/88). The argument in that case was that Goldberg's and Linnco's conduct in increasing the margin requirements with only one-hour notice was unreasonable under the circumstances. Goldberg and Linnco settled with the plaintiff, leaving only Capital as a defendant, and Capital agreed

with the plaintiff. The Administrative Law Judge concluded that their conduct was unreasonable given the market conditions that day and awarded reparations to the plaintiff. Capital agrees that Goldberg and Linnco, as nonparties, are not bound by *Kimmel.* Instead, Capital argues that the reasoning in *Kimmel* supports its contention that the increase in margin requirements was unreasonable and thus in bad faith. The district court rejected Capital's attempt to support its argument with this uncontested administrative ruling.

ing to establish breach of contract, Capital has also failed to satisfy its claim for tortious interference because it has not submitted evidence that Goldberg and Linnco acted with a desire to harm Capital for reasons unrelated to the financial interest that they were trying to protect. Therefore, the decision of the district court granting summary judgment in favor of Goldberg and Linnco is AFFIRMED.