EZRA V. MOSS, JR., EVCO CONSTRUCTION CO., INC., GARY H. WATTS, TROY D. POLLARD, BENNIE J. SPRINGS AND AUDREY SPRINGS, PLAINTIFF-APPELLEES AND CROSS-APPELLANTS v. J.C. BRADFORD AND COMPANY AND J.C. BRADFORD FUTURES, INC., DEFENDANT-APPELLANTS AND CROSS-APPELLEES

No. 332PA93

(Filed 29 July 1994)

**Securities and Investment Regulations § 119 (NCI4th)— stock index futures contracts—under-margined accounts—liquidation without notice to customer**

The pervasive federal regulatory scheme for futures trading, including Chicago Mercantile Exchange Rule 827, is designed to afford maximum protection to the commodities merchants and the commodities exchanges themselves and therefore permits the liquidation of a customer's under-margined account without prior demand or notice. Therefore, defendant merchant acted properly in liquidating plaintiffs' under-margined stock index futures contracts during the stock-market crash of October 1987 without notice to plaintiffs where plaintiffs had failed to meet a previous margin call and another margin call was imminent. Any terms of the customer contract contrary to the federal regulatory scheme would be unenforceable.

**Am Jur 2d, Securities Regulation—State §§ 95 et seq.**

Chief Justice EXUM did not participate in the consideration or decision of this case.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a decision of the Court of Appeals, 110 N.C. App. 788, 431 S.E.2d 531 (1993), affirming a judgment entered by Allen (C. Walter), J., on 5 February 1992, in the Superior Court, Mecklenburg County. Heard in the Supreme Court on 14 March 1994.

*Howard M. Widis; and Hedrick, Eatman, Gardner & Kincheloe, by Hatcher B. Kincheloe, for the plaintiff-appellees/cross-appellants.*

*Moore & Van Allen, by James P. McLoughlin, Jr., for the defendant-appellants/cross-appellees.*

**MOSS v. J.C. BRADFORD AND CO.**

[337 N.C. 315 (1994)]

*Kennedy Covington Lobdell & Hickman, by James P. Cooney III, for Interstate/Johnson Lane Corporation, amicus curiae.*

*McDermott, Will & Emery, by Paul J. Pantano, Jr., and Patterson, Harkavay & Lawrence, by Martha A. Geer, for The Futures Industry Association, Inc., amicus curiae.*

MITCHELL, Justice.

The issue before us in this case is whether the defendant-appellants (hereinafter "Bradford") wrongfully liquidated the accounts of the plaintiff-appellees (hereinafter "plaintiffs") on the Chicago Mercantile Exchange (hereinafter "CME"). We hold that they did not; therefore, we reverse the decision of the Court of Appeals.

The plaintiffs instituted this action on 15 February 1988. In their complaint, the plaintiffs alleged, *inter alia*, that by liquidating their accounts, Bradford breached the terms of an agreement the parties had executed when the plaintiffs began trading on the CME using Bradford as their broker. The complaint sought both compensatory and punitive damages. Bradford filed a motion for summary judgment and the plaintiffs filed a motion for partial summary judgment. Judge Chase Saunders denied the plaintiffs' motion and granted Bradford's motion in part, dismissing the plaintiffs' claim for punitive damages. The Court of Appeals affirmed. *See Moss v. J.C. Bradford and Co.*, 103 N.C. App. 393, 407 S.E.2d 902 (1991) (case reported without published opinion). The case was then tried before a jury at the 13 January 1992 Civil Session of Superior Court, Mecklenburg County.

Before reviewing the evidence introduced at trial, we believe a brief discussion of certain uncontested facts and of the nature of futures trading would be helpful. The present case involves trading in stock index futures contracts. A stock index futures contract is an agreement to buy or sell a "basket" of certain stocks on a specific date in the future. 1988 Report of the Presidential Task Force on Market Mechanisms, Study VI, at 18. The basket of stocks in each of the plaintiffs' contracts consisted of stocks listed in the Standard & Poor's 500 Index. The Standard & Poor's 500 Index is based on the aggregate increase or decrease in the stock prices of 400 industrial companies, forty utilities, twenty transportation companies and forty financial institutions. *Id.* The owner of the futures contract does not hold any equity interest in any of these companies. *Id.* Similarly, no actual physical transfer of the stocks takes place on the date of delivery. *Id.* Rather, a cash transfer occurs with the owner of the contract

MOSS v. J.C. BRADFORD AND CO.

[337 N.C. 315 (1994)]

either receiving or paying money depending upon whether the index on the date of delivery is above or below the index as it stood on the date the investor purchased the contract. *Id.* at 18-19.

While the stocks contained in each contract are "delivered" only on a quarterly basis, *id.* at 19, the stock index futures contracts are "traded" on a daily basis—that is, the daily fluctuation in the Standard & Poor's 500 Index is monitored and contract owners enjoy profits or incur losses depending upon whether the index has risen or fallen during the course of the trading day. *Id.* at 24. The CME values each index point at $500. *Id.* at 19. Thus, a one-point net increase in the index during the CME trading day would result in a $500 profit per stock index futures contract owned. A one-point net decrease in the index would result in a $500 loss per contract. The CME credits profits and debits losses at the conclusion of each trading day. *Id.* at 24. Any profits resulting from a rise in the index are immediately available to the customer. *Id.* Similarly, the day's losses are immediately due to the CME. *Id.*

The plaintiffs purchased their stock index futures contracts on "margin," which is standard industry practice. A "margin" is a minimum deposit that an index futures contract buyer must place into an account with a merchant,[1] such as Bradford, who trades on the CME. *Id.* at 23. It is intended to ensure the investor's ultimate performance of the contract and to offset losses in the meantime caused by daily fluctuations in the index. *Id.* At the time of the occurrences giving rise to this dispute, the CME had established an "initial margin" of $10,000 per stock index futures contract purchased. *Id.*

The CME had also established a "maintenance margin" of $5,000.[2] *Id.* Under such a scheme, if losses at the end of a trading day cause a customer's account to fall below the $5,000 maintenance margin, the merchant pays the CME the amount of the losses and then issues a "margin call" to the losing customer. *Id.* The margin call requires the

---

1. "The futures commission merchant . . . is the commodities equivalent of a securities broker." 1988 Report of the Presidential Task Force on Market Mechanisms, Study VI, at 21. Courts generally, and the parties in their original agreement and elsewhere in this case, tend to use the terms "broker" and "merchant" interchangeably in the context of futures contracts trading. The distinctions between the two are not determinative of the rights of the parties in the present case, so we will not explore them in this opinion.

2. Merchants are free to set the initial and maintenance margins at levels higher than those established by the CME. Bradford, however, used the margin levels established by the CME.

customer to restore his account to the initial margin level (i.e., the customer must restore his account to at least $10,000 per contract). *Id.* If the customer cannot "meet the margin," the merchant nevertheless is responsible to the CME for the amount of the customer's losses. Although the merchant is liable for its customers' losses, it does not share in its customers' daily profits. Rather, the merchant receives a commission only at the initial purchase of the contract and at the subsequent "delivery" of the stock.

We turn now to the evidence introduced at the trial of this matter, which tended to show the following. The plaintiffs are North Carolina residents who were engaged in futures contract trading on the CME. In September 1987, the plaintiffs purchased seven Standard & Poor's 500 Index futures contracts through the Charlotte, North Carolina, offices of Bradford, a national brokerage firm headquartered in Nashville, Tennessee.

This particular dispute arose out of the stock market crash of October 1987. Under normal trading conditions, the Standard & Poor's 500 Index moves up or down only three to five points during the trading day. On Monday, 19 October 1987, however, the index fell 80.75 points, resulting in an aggregate loss to the plaintiffs of $282,625. As a result, Bradford issued a margin call to the plaintiffs. One of the plaintiffs, Ezra Moss, represented himself and all of the other plaintiffs in their dealings with Bradford. To satisfy the Monday margin call, Moss brought 23,988 shares of stock in Southern National Corporation to Bradford's Charlotte offices. Under CME Rules, this type of "over-the-counter" stock cannot be used to satisfy a margin call. Therefore, this stock served as security for a loan from Bradford to Moss. Moss used this loan to meet the Monday margin call.

The market continued to spiral downward. Even with the loan the plaintiffs had secured using the Southern National stock as collateral, Bradford determined on Tuesday morning, 20 October 1987, that $105,000 was still needed to restore the plaintiffs' accounts to the $10,000 initial margin. Bradford employee Ed Caulfield contacted Moss by telephone at 8:00 a.m. EDT on Tuesday and informed him that the plaintiffs needed to meet an additional margin call of $105,000. Moss disputed this amount and indicated to Caulfield that the plaintiffs would have a difficult time satisfying a $105,000 margin call. Moss ultimately told Caulfield that he would be willing to bring $65,000 to Bradford's offices. Caulfield then informed Moss that Caulfield's superior, Roy Leslie, had issued the margin call and that

Leslie wanted to speak with Moss. Moss, however, refused to contact Leslie because, as Moss later explained at trial, he wanted to remain in the index futures market and he believed that Leslie would try to convince him to get out of the market.

Following his conversation with Caulfield, Moss waited ninety minutes for the CME to open and then traveled to the offices of the other plaintiffs in an attempt to raise the $65,000. He telephoned Caulfield twice during this time from the offices of the other plaintiffs. During these conversations, Caulfield reiterated that his superiors were expecting the plaintiffs to pay around $100,000 and implored Moss to contact Roy Leslie. Moss continued to dispute the amount and again refused to telephone Leslie. When Moss finally collected the $65,000 around 10:55 a.m. EDT, he contacted Caulfield and the two men agreed to meet in the parking lot outside Bradford's offices. Moss later explained at trial that he preferred to meet with Caulfield in the parking lot because he was too embarrassed to go into Bradford's offices to meet a margin call and "wasn't much in a frame [of mind] to have any small talk."

After speaking with Moss, Caulfield relayed the subject matter of the conversation to Roy Leslie, who instructed Caulfield to sell $40,000 worth of Moss' Southern National stock in order to satisfy the remainder of the $105,000 margin call. Caulfield attempted to contact Moss to inform him of the impending sale of the stock, but could not reach him.

In the meantime, the stock index futures market continued to plummet. Bradford determined that another margin call would be necessary when the index fell to 191.5. Bradford therefore decided to enter a "stop loss order" for the plaintiffs' contracts at an index of 190. This meant that if the index fell to 190, the plaintiffs' accounts would be liquidated, i.e., all of the plaintiffs' stock index futures contracts would be sold at the then-prevailing market price. Caulfield attempted to contact Moss to apprise him of Bradford's decision but could not reach him. Bradford entered the stop loss order at about 11:10 a.m. EDT. The index reached 190 at about 11:35 a.m. EDT and the plaintiffs' accounts were liquidated pursuant to the stop loss order. Moss arrived at Bradford's offices at about this time. Although Caulfield had not yet come outside, Moss chose not to enter Bradford's offices. Caulfield met Moss in the parking lot ten to fifteen minutes after Moss' arrival and informed Moss that Bradford had already liquidated the plaintiffs' accounts.

MOSS v. J.C. BRADFORD AND CO.

[337 N.C. 315 (1994)]

At the close of the plaintiffs' evidence and at the close of all the evidence, Bradford moved for a directed verdict. The trial court denied both motions. The jury subsequently returned a verdict in favor of the plaintiffs awarding them damages in the amount of $175,000. Bradford moved for a judgment notwithstanding the verdict, or in the alternative, a new trial. The plaintiffs moved for a judgment in the amount of $242,000, notwithstanding the verdict. The trial court denied both motions.

Both parties appealed to the Court of Appeals, which affirmed the trial court. *Moss v. J.C. Bradford and Co.*, 110 N.C. App. 788, 431 S.E.2d 531 (1993). The Court of Appeals concluded that the evidence, taken in the light most favorable to the plaintiffs, tended to show that (1) the contract between the parties required Bradford to issue a margin call and give the plaintiffs a reasonable time in which to meet the margin call before liquidating the plaintiffs' accounts, (2) Moss was making a good faith effort to meet the $105,000 margin call at the time Bradford liquidated the plaintiffs' accounts, (3) Roy Leslie believed that the $65,000 Moss was attempting to collect, combined with the $40,000 in proceeds from the sale of the Southern National stock, would meet the Tuesday $105,000 margin call and (4) Bradford never expressly informed Moss that if he did not arrive with the requisite funds by a certain time, he risked a liquidation of the plaintiffs' accounts. *Id.* at 794, 431 S.E.2d at 534. From this evidence, the Court of Appeals further concluded that the jury reasonably could have determined that Bradford had breached the agreement between the parties by liquidating the plaintiffs' accounts without providing the plaintiffs a reasonable time within which to meet the margin call. *Id.* The Court of Appeals therefore held that the trial court properly denied Bradford's motions for a directed verdict, for a judgment notwithstanding the verdict, and for a new trial. *Id.* The Court of Appeals also found no error in (1) the trial court's denial of Bradford's request for two special instructions and (2) the trial court's denial of the plaintiffs' motion for a judgment notwithstanding the verdict. *Id.* at 794-95, 431 S.E.2d at 534-35. These latter two issues are not before this Court for review, however, and thus those portions of the Court of Appeals' opinion shall remain undisturbed. This Court granted Bradford's petition for discretionary review on 7 October 1993. *Moss v. J.C. Bradford and Co.*, 334 N.C. 688, 436 S.E.2d 381 (1993).

By its single assignment of error before this Court, Bradford argues that the trial court erred by failing to rule that, as a matter of law, Bradford did not breach its agreement with the plaintiffs.

**MOSS v. J.C. BRADFORD AND CO.**

[337 N.C. 315 (1994)]

Paragraph 5 of the parties' agreement provides, in pertinent part, as follows:

> Customer agrees to maintain at all times such margins in and for Customer's account as Bradford, in its sole and absolute discretion, may from time to time require. Such margin requirements . . . may be changed by Bradford at any time without prior notice to Customer. . . . If *at any time* Customer's account does not contain the amount of margin and/or premium required by Bradford, Bradford may, *at any time, without notice* close out Customer's open positions in whole or in part and take any action described in paragraph 9 hereof.

(Emphasis added.) Paragraph 9 of the agreement provides, in pertinent part, as follows:

> Customer hereby authorizes Bradford *in its sole and absolute discretion* to close out Customer's account in whole or in part, sell any or all of Customer's property held by Bradford, buy or sell any securities, commodities, commodity futures, or options contracts, or other property in Customer's account, or cancel any outstanding orders to close out any account of Customer or to close out any commitment made by Bradford on behalf of Customer should any of the following events occur: . . . (v) the property deposited in Customer's account shall be determined by Bradford, in its sole and absolute discretion, and regardless of current market quotations, to be inadequate to secure the account; (vi) Customer's account shall incur a deficit balance; . . . (viii) at any time Bradford shall reasonably in good faith feel insecure with respect to the sufficiency of the property deposited by Customer; (ix) for any other reason whatsoever that Bradford in good faith shall determine it necessary to take the aforementioned action for its protection and/or the protection of its other customers. Such sale, purchase or cancellation may be made at Bradford's discretion on the contract market or at public auction or at private sale, without advertising the same and *without notice, prior tender, demand or call upon Customer.*

(Emphasis added.)

The foregoing language notwithstanding, the jury determined, and the Court of Appeals agreed, that before liquidating the plaintiffs' accounts, Bradford was under a contractual duty to issue a margin call and provide the plaintiffs a reasonable time within which to meet

that margin call. Bradford contends, however, that paragraphs 5 and 9 unambiguously gave it the right to liquidate the plaintiffs' accounts whenever it deemed itself at risk and without issuing a margin call or providing the plaintiffs with notice of its intent to liquidate their positions. We neither reach nor decide this question. Instead, we conclude that Bradford did not wrongfully liquidate the plaintiffs' accounts, but for different reasons.

Commodities futures trading takes place in the context of extensive federal regulation. *See generally Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 356-67, 72 L. Ed. 2d 182, 187-94 (1982). Congress first legislated in the area of futures trading in 1921 with its enactment of the Future Trading Act. *Id.* at 360, 72 L. Ed. 2d at 190. The following year, however, the Supreme Court of the United States held the Future Trading Act unconstitutional as an improper exercise of Congress' taxing power. *See Hill v. Wallace*, 259 U.S. 44, 66 L. Ed. 822 (1922). Congress immediately responded with the Grain Futures Act, which contained the non-offending regulatory provisions of the Future Trading Act. *Curran*, 456 U.S. at 361, 72 L. Ed. 2d at 190. Congress substantially amended the Grain Futures Act in 1936, renaming it the Commodity Exchange Act. *Id.* at 362, 72 L. Ed. 2d at 191. Congress has since amended the Act on a number of occasions. *Id.* at 364-67, 72 L. Ed. 2d at 192-94.

The 1974 amendments to the Act were significant in that they created the Commodity Futures Trading Commission (hereinafter "CFTC"). *Id.* at 365, 72 L. Ed. 2d at 193; *see also* 7 U.S.C. § 4a (1988). Pursuant to the 1974 amendments, the CFTC has "exclusive jurisdiction over commodity futures trading."

*Curran*, 456 U.S. at 386, 72 L. Ed. 2d at 206; 7 U.S.C. § 2a(ii) (1988). While the various commodities exchanges remain free to promulgate their own rules, Congress has authorized the CFTC to disapprove exchange rules that are inconsistent with the Commodity Exchange Act and to supplement or alter exchange rules as the CFTC deems necessary. *Curran*, 456 U.S. at 364-66, 72 L. Ed. 2d at 192-93; *see also* 7 U.S.C. §§ 7a(12), 12a(7) (1988). The single exception is with regard to the setting of margin levels, which traditionally has been left entirely within the province of the individual commodities exchanges. *See* 7 U.S.C. §§ 7a(12), 12a(7). The setting of margin levels was "accorded a special status in the regulatory scheme of the Commodity Exchange Act so that futures commission [merchants would be] able to assure their own financial integrity, which, in turn, contributes

to the financial integrity of the entire marketplace." *Capital Options Investments v. Goldberg Bros.*, 958 F.2d 186, 190 (7th Cir. 1992). Congress amended the Act in 1992, however, to provide for review by the Federal Reserve Board of any exchange rule establishing or altering an initial or maintenance margin for stock index futures contracts. *See* 7 U.S.C.A. § 2a(vi) (Supp. 1994). Pursuant to its authority under the 1992 amendments, the Federal Reserve Board delegated this power of review to the CFTC. *See* 58 Fed. Reg. 26979 (1993). In so doing, however, the Federal Reserve Board continued to recognize the importance of appropriate levels of margin to the financial integrity of the market. *Id.*

To implement the authority granted it by the Commodity Exchange Act, the CFTC has promulgated an extensive set of regulations. *See* 17 C.F.R. §§ 1.1 to 190.10 (1993). These range from provisions governing a principal's liability for the conduct of those acting on his or her behalf, *see* 17 C.F.R. § 1.2 (1993), to provisions regarding the bankruptcy of a commodities merchant. *See* 17 C.F.R. § 190.10 (1993). Of particular interest in the present case is 17 C.F.R. § 1.55, which mandates that a futures merchant provide each of its customers with a "Risk Disclosure Statement," the content of which is specifically set forth in the regulation. Each of the plaintiffs in the case at bar received and signed a copy of this disclosure statement, which states in pertinent part:

### RISK DISCLOSURE STATEMENT

This statement is furnished to you because Rule 1.55 of the Commodities Futures Trading Commission requires it.

The risk of loss in trading commodity futures contracts can be substantial. You should therefore carefully consider whether such trading is suitable for you in light of your financial condition. In considering whether to trade, you should be aware of the following:

1. You may sustain a total loss of the initial margin funds and any additional funds that you deposit with your broker to establish or maintain a position in the commodity futures market. If the market moves against your position, you may be called upon by your broker to deposit a substantial amount of additional margin funds, on short notice, in order to maintain your position. If you do not provide the required funds within the prescribed time,

your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account.

. . . .

5. The high degree of leverage that is often obtainable in futures trading because of the small margin requirements can work against you as well as for you. The use of leverage can lead to large losses as well as gains.

This brief statement cannot, of course, disclose all the risks and other significant aspects of the commodity markets. You should therefore carefully study futures trading before you trade.

The rules of the various exchanges, promulgated as they are with express Congressional authorization and, in most cases, having been approved by the CFTC, possess the force of law. *See Taylor v. Motor Co.*, 227 N.C. 365, 367, 42 S.E.2d 460, 461 (1947) ("[I]t is well settled that an Act of the Congress in exercise of the powers conferred by the Federal Constitution is supreme . . . [a]nd proper regulations authorized under the Act have the binding effect of law."). They are therefore binding on all who trade on such exchanges, both merchants and their customers. *See Case & Co., Inc. v. Board of Trade of City of Chicago*, 523 F.2d 355, 358 (7th Cir. 1975) (rules adopted by an exchange "govern trading in commodities futures on the exchange and are incorporated into every contract"); *Daniel v. Board of Trade of City of Chicago*, 164 F.2d 815, 818-19 (7th Cir. 1947) (traders on an exchange are bound by the rules and regulations of the exchange and all transactions on the exchange are subject to those rules and regulations). Indeed, "Congress primarily has relied upon the exchanges to regulate the contract markets." *Curran*, 456 U.S. at 382, 72 L. Ed. 2d at 203. The CME therefore has promulgated its own rules governing, *inter alia*, the trading of stock index futures contracts. Most important to the present case is CME Rule 827, which provides, in pertinent part, as follows:

D. The [merchant] may call for additional margins at his discretion, but whenever a customer's margins are depleted below the minimum amount required, the [merchant] must call for such additional margins as will bring the account up to initial margin requirements, and if within a reasonable time the customer fails to comply with such demand (the [merchant] may deem one hour to be a reasonable time), the [merchant] may close out the cus-

**MOSS v. J.C. BRADFORD AND CO.**

[337 N.C. 315 (1994)]

tomer's trades or sufficient contracts thereof to restore the customer's account to required margin status.

E. If the [merchant] is unable to effect personal contact with a customer, a written demand left at the customer's place of business or a telegram sent to the customer at his address furnished by him to the [merchant] shall be deemed sufficient.

F. [Merchants] shall be responsible to the Exchange for all margin requirements.

G. Violation of this rule constitute[s] a major offense.

H. In the event of the failure of a [merchant] to maintain customer margins as required under this rule, the President [of the Exchange] may order such [merchant] to immediately close out all or such part of the positions on his books so as to correct the delinquency.

Rules of this sort governing margin calls and account liquidation are for the protection of the merchant and, ultimately, for the protection of the commodities exchange itself. *See Geldermann & Co., Inc. v. Lane Processing, Inc.*, 527 F.2d 571, 576-77 (8th Cir. 1975). In *Geldermann*, the United States Court of Appeals for the Eighth Circuit rejected the challenge of a commodities exchange customer to liquidation provisions contained in a "commodities signature card" and in Rule 209 of the Chicago Board of Trade. The commodities signature card, which the customer had executed when it began its futures trading, provided that the merchant could liquidate the customer's accounts "without prior demand or notice" if the customer "fail[ed] to maintain with [the merchant] at all times such margin as [the merchant] may deem adequate for [the merchant's] protection." *Id.* at 574. Chicago Board of Trade Rule 209, which is quite similar to CME Rule 827, provided that a merchant could require the customer to deposit additional sums of money "to the extent of any adverse fluctuations in the market price." *Id.* at 575. The rule further provided that "[s]uch deposits must be made with the . . . merchant within a reasonable time after demand, and, in the absence of unusual circumstances, one hour shall be deemed a reasonable time." *Id.* If the customer failed to deposit the funds within the guidelines prescribed by the merchant, the merchant was entitled under the rule to liquidate the customer's accounts. *Id.* Finally, Rule 209, like CME Rule 827(E), provided that if the merchant "is unable to effect personal contact with the customer, a written demand left at the office of the customer,

**MOSS v. J.C. BRADFORD AND CO.**

[337 N.C. 315 (1994)]

during business hours, shall be deemed sufficient." *Id.* The customer challenged both the commodities signature card and Rule 209 on the ground that they were unconscionable and therefore unenforceable.

The Eighth Circuit disagreed, noting initially that the customer "was a sophisticated investor" who "voluntarily assumed the risks inherent in futures trading." *Id.* at 576. The court then went on to conclude that the liquidation provision in the signature card, which permitted liquidation without prior demand or notice, "was eminently reasonable in light of the commercial background of futures trading." *Id.* The court explained this commercial background as follows:

> It is clear that the liquidation provision promoted the interest and protection of the commissions merchants, their customers and the investing public as a whole. Investors or speculators who have failed to deposit sufficient maintenance margins may have insufficient financial resources to withstand substantial losses on the market and, if so, continued trading on that account is a financial risk for the commission merchant, and ultimately for the commodities exchange if the loss suffered by the commission merchant exceeds its capital account. *Imposing requirements of demand and notification, particularly where it would be extremely difficult or time-consuming to contact an investor, may violate the manifest purpose of the liquidation provision.*

*Id.* at 577 (emphasis added). The court also determined that Rule 209 withstood attack on unconscionability grounds since it "complements the liquidation provision in the signature card by affording commission merchants an opportunity to quickly determine whether an investor is going to maintain his margin." *Id.* at 578.

In light of the fact that rules governing margin calls and account liquidation are for the protection of the merchant and the commodities exchange itself, we interpret the federal regulatory scheme in the area of futures trading, including CME Rule 827, to permit the liquidation of a customer's account without prior demand or notice. It is through the setting of margin levels, the issuance of margin calls and account liquidation that commodities futures merchants "are able to assure their own financial integrity, which, in turn, contributes to the financial integrity of the entire marketplace." *Goldberg Bros.*, 958 F.2d at 190. The CFTC, which possesses "exclusive jurisdiction over commodity futures trading," has taken steps to apprise potential investors of the importance of margins and the very real possibility of account liquidation via its Risk Disclosure Statement. The CFTC Risk

**MOSS v. J.C. BRADFORD AND CO.**

[337 N.C. 315 (1994)]

Disclosure Statement specifically warns prospective customers that if they fail to restore their accounts to the initial margin level within the guidelines prescribed by their merchant, their "position may be liquidated at a loss, and [they] will be liable for any resulting deficit in [their] account." Finally, the CME, on which Congress relies to regulate the stock index futures market, has promulgated Rule 827, which requires a merchant to ensure that its customers maintain their accounts at the initial margin level and allows the merchant to liquidate a customer's account if necessary to restore the account to the initial margin level. To achieve the protective purposes of this federal regulatory scheme, it is imperative that futures merchants be able to act quickly and decisively to liquidate a customer's account when, as in the present case, a precipitously declining market demands such action. We conclude therefore that the federal scheme, including Rule 827, contemplates and permits *but does not require* a demand, i.e., margin call, or notice prior to liquidating a customer's account.

The plaintiffs contend, however, that Rule 827 requires that the merchant provide the customer with notice of the merchant's intent to liquidate and allow the customer an opportunity to meet yet another margin call before liquidating the customer's accounts. We disagree. As previously explained, CME Rule 827 is intended to protect the merchants trading on the CME and the CME itself. The essential thrust of Rule 827 therefore is that if the merchant chooses not to liquidate an under-margined customer, the merchant *at least* must issue a margin call. Thus, while the merchant may either liquidate the under-margined customer's accounts without notice to the customer or provide the customer an opportunity to restore his account to the initial margin, the exchange rules prohibit a merchant from continuing to "carry" an under-margined customer to the detriment of the merchant, the CME and, ultimately, the national economy.

In the present case, Bradford, in the midst of a market free-fall, was faced with a group of under-margined customers who had yet to meet a previous margin call and for whom another margin call was imminent. For its own protection and for the protection of the CME, Bradford chose to liquidate the accounts of those customers rather than issue another margin call. Bradford's conduct in this regard was entirely consistent with governing federal law and therefore proper. Further, Bradford attempted to provide the plaintiffs with notice of its intent to liquidate their accounts. Thus, although it was not legally obligated to do so, Bradford attempted to provide the plaintiffs with the notice to which they erroneously insist they were entitled.

MOSS v. J.C. BRADFORD AND CO.

[337 N.C. 315 (1994)]

In short, we conclude that the pervasive federal regulatory paradigm in the area of futures trading, including CME Rule 827, is designed to afford maximum protection to the commodities merchants and the commodities exchanges themselves and therefore permits the liquidation of a customer's under-margined account *without prior demand or notice*. We recognize that a number of courts who have previously considered similar issues have based their holdings in favor of the merchant on contract language nearly identical to that found in the customer agreement between the parties in the case at bar. *See, e.g., Goldberg Bros.*, 958 F.2d 186 (7th Cir. 1992); *Modern Settings, Inc. v. Prudential-Bache*, 936 F.2d 640 (2d Cir. 1991); *Prudential-Bache Securities, Inc. v. Stricklin*, 890 F.2d 704 (4th Cir. 1989); *Misabec Mercantile, Inc. v. Donaldson*, 853 F.2d 834 (11th Cir. 1988). Bradford also would have us decide in its favor based on the language of the customer agreement. We find it unnecessary to reach the terms of the contract, however, since any terms contrary to the federal regulatory scheme in the area of futures trading would be unenforceable. *Gore v. Ball, Inc.*, 279 N.C. 192, 203, 182 S.E.2d 389, 395 (1971) (contractual provisions contrary to public policy will not be enforced). Since the federal regulatory scheme is designed to afford merchants and commodities exchanges with maximum protection, any terms of the customer agreement which exposed Bradford (and thereby the CME) to a risk greater than that allowed by federal law would be unenforceable. The federal regulatory scheme therefore controls and entitled Bradford to liquidate the plaintiffs' accounts without notice.[3]

For the foregoing reasons, we hold that Bradford was entitled to judgment as a matter of law. The trial court therefore erred in refusing to grant Bradford's motions for a directed verdict and for a judgment notwithstanding the verdict. The Court of Appeals erred in affirming the trial court. Accordingly, we reverse the Court of Appeals and remand this case to the Court of Appeals for further remand to the Superior Court, Mecklenburg County, for the entry of a judgment in favor of the defendants.

---

3. We also recognize that the United States District Court for the Southern District of New York has stated its belief that under 7 U.S.C. § 6b, the anti-fraud provision of the Commodities Exchange Act, a merchant may not liquidate a customer's account without first issuing a margin call. *See Cauble v. Mabon Nugent & Co.*, 594 F. Supp. 985, 990 (1984). The court noted, however, that this margin call requirement could be waived by contract. *Id.* We do not find this case persuasive and therefore decline to follow it in the present case.

**HALES v. N.C. INSURANCE GUARANTY ASSN.**

[337 N.C. 329 (1994)]

REVERSED AND REMANDED.

Chief Justice Exum did not participate in the consideration or decision of this case.