NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

DESERT MOUNTAIN CLUB INC., *Plaintiff/Appellee,*

*v.*

ERIC GRAHAM, et al., *Defendants/Appellants.*

No. 1 CA-CV 17-0100
FILED 4-12-2018

Appeal from the Superior Court in Maricopa County
Nos. CV2014-015333, CV2014-015334, CV2014-015335
(Consolidated)
The Honorable David B. Gass, Judge

**AFFIRMED**

COUNSEL

Fennemore Craig, PC, Phoenix
By Christopher L. Callahan, Theresa Dwyer, Jennifer L. Blasko
*Counsel for Plaintiff/Appellee*

Baird Williams & Greer, LLP, Phoenix
By Daryl M. Williams, Annelise M. Dominguez
*Counsel for Defendants/Appellants*

_____

**MEMORANDUM DECISION**

_____

Judge Peter B. Swann delivered the decision of the court, in which Presiding Judge Jon W. Thompson and Judge James P. Beene joined.

_____

**S W A N N**, Judge:

¶1          This case concerns a dispute between members of a golf club, who sought to resign their memberships, and the club, which sued to hold the members to their obligations under its bylaws. The superior court granted the club summary judgment and the members appeal. We conclude that the bylaws did not grant the members a unilateral right to resign without obligation, and that the divestiture provisions in the bylaws barred resignation pursuant to A.R.S. § 10-3620. We therefore affirm.

## FACTS AND PROCEDURAL HISTORY

¶2          Eric and Rhona Graham and Thomas and Barbara Clark (collectively "Members") purchased equity memberships from the predecessor entity of Desert Mountain Club Inc. ("Club"), a non-profit member-owned golf and recreation club located in Scottsdale. The Members retained their equity memberships when the Club took control in December 2010, and signed a Membership Conversion Agreement, stating that they would comply with the terms of that Agreement, the Club's bylaws, and its rules and regulations. As equity members of the Club, the Members had access to its facilities and were eligible to vote at its meetings, were responsible for sharing in its deficits, and were entitled to a share of its assets in the event of dissolution. The Club controlled the total number of equity members and the admissions process for new members.

¶3          The Club amended its bylaws in 2010, 2012, 2013, and 2014, but the parties agree that the relevant provisions did not change. The bylaws expressly allow a member to terminate membership with the Club in four ways: (1) resale through the Club, (2) transfer to a purchaser of the member's real property within the Desert Mountain residential community, (3) transfer to a Club-approved family member, or (4) reissuance to a new person by the Club upon the member's death. The bylaws mention no other means of divestiture.

¶4            To resell a membership, an existing equity member must surrender it to the Club for resale, and must continue to pay all Club dues and fees until the membership is sold.  Upon resale, the selling member may collect the proceeds, but must pay the Club a transfer fee of $65,000 or 20% of the sale price, whichever is greater.  The bylaws give the Club's Board discretion on how to resolve issues with the resale of memberships and with members who are delinquent on payments.

¶5            The Clarks sent a letter to the Club in late 2013 stating that they were resigning as of January 1, 2014, and asserted that the resignation "terminates [their] obligation to pay dues and assessments."   Likewise, the Grahams stopped making payments to the Club in May 2014, asserting in an email that they were resigning their membership and therefore had "no further obligation" to the Club.  Both the Grahams and the Clarks impliedly contended that their resignation would relieve them of their obligation to pay the transfer fee upon any resale of their membership.  In the past, the Club had expelled other equity members who stopped paying their dues, and relieved them of their obligation to pay the transfer fee.  More recently, the Club and an equity member who stopped making payments entered a settlement agreement that allowed the member to pay a reduced transfer fee.

¶6            In December 2014, the Club filed separate lawsuits against the Grahams, the Clarks, and Barry and Lori Fabian — a couple who similarly attempted to resign their membership in the Club but who are not parties to this appeal.  The Club moved for summary judgment against the Fabians, and the court granted the motion in October 2015.  In December 2015, the court consolidated the three lawsuits.  And in January 2016, shortly after receiving favorable judgment against the Fabians, the Club moved for summary judgment against the Clarks and the Grahams.  The court granted the motions, adopting the reasoning of the Fabian court.  The Members timely appeal.

## DISCUSSION

¶7            Summary judgment is proper if "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Ariz. R. Civ. P. 56(a).  We review a grant of summary judgment de novo, and we view the facts in the light most favorable to the non-moving party.  *St. George v. Plimpton*, 241 Ariz. 163, 165, ¶ 11 (App. 2016).  We also review the superior court's legal conclusions, including its interpretation of statutes and contracts, de novo.  *Dreamland Villa Cmty. Club, Inc. v. Raimey*, 224 Ariz. 42, 46, ¶ 17 (App. 2010).

## I. THE CLUB'S BYLAWS AND A.R.S § 10-3620 DO NOT GRANT THE MEMBERS A UNILATERAL RIGHT TO RESIGN.

¶8　　　　The Members contend that the bylaws allowed them to resign from the Club without obligation because the bylaws' terms do not explicitly address resignation and because A.R.S. § 10-3620, which specifically permits resignation, is incorporated into the bylaws by operation of law. *See Qwest Corp. v. City of Chandler*, 222 Ariz. 474, 485, ¶ 37 (App. 2009). Section 10-3620 provides:

> A. A member may resign at any time, *except as set forth in or authorized by the articles of incorporation or bylaws.*
>
> B. The resignation of a member does not relieve the member from any obligations the member may have to the corporation as a result of obligations incurred or commitments made prior to resignation.

(Emphasis added.)

¶9　　　　The parties do not dispute the bylaws' terms. Rather, they disagree over whether the rules on membership divestment are sufficiently comprehensive and exclusive to preclude resignation as a matter of contract and to invoke the statutory exception to the right of resignation. While the bylaws do not use the term "resignation," we conclude that the bylaws do create a comprehensive rule. *See Smith v. Melson, Inc.*, 135 Ariz. 119, 122 (1983) (holding that "the purpose of an agreement is to be divined from the entire instrument and the surrounding circumstances"). By providing a specific list of four ways to divest membership, and by requiring members to continue to pay dues until they have successfully divested their membership, the bylaws effectively bar the possibility of simple resignation. Any other interpretation would render remaining bylaws ineffective by allowing members to avoid the Club's transfer fee and their continuing responsibility for dues. An interpretation that allows members to freely resign would also require the Club to place additional financial burdens on the remaining members at the discretion of resigning members, and would render the extensive scheme of rules requiring resale through the Club meaningless. *See Scholten v. Blackhawk Partners*, 184 Ariz. 326, 329 (App. 1995).

¶10　　　　The Members challenge the divestiture provisions of the bylaws as burdensome because memberships are not as liquid as they would prefer, and the divestiture process is both burdensome and expensive. Though these criticisms are well-founded, they only describe

the contractual arrangement between members and the Club — they do not undo it.

¶11          Section 10-3620 does not guarantee a member of a non-profit the right to resign without obligation.  By its terms, the statute allows articles or bylaws to restrict the default right of resignation.  The Members urge us to interpret the exception "except as provided by the . . . bylaws" to apply only to the phrase "at any time," and not to the right of resignation itself.  To support their argument, the Members invoke the "last antecedent rule," which "requires that a qualifying phrase be applied to the word or phrase immediately preceding [it] as long as there is no contrary intent indicated." *Phoenix Control Sys., Inc. v. Ins. Co.*, 165 Ariz. 31, 34 (1990).  But here, a plain reading of the statute shows that the exception's antecedent phrase is the entire phrase, "[a] member may resign at any time," rather than the second portion of the antecedent phrase — a phrase within a phrase — "at any time."  Separating the sub-phrase "at any time" would not fit within the scheme of the statute, as nowhere else does § 10-3620 mention the timing of a resignation, only resignation itself. *See Bell v. Indus. Comm'n of Ariz.*, 236 Ariz. 478, 482, ¶ 16 (2015) (reading a statute as a whole).  And § 10-3620(B), which requires a member to fulfill all obligations incurred before resignation, evinces an intent contrary to the Members' proposed course of action.  In their view, a resignation would relieve them of their obligation to pay the Club's transfer fee and monthly dues.  Nothing in the language of the statute or the bylaws suggests that such a result is possible without the exercise of discretion by the Club.

II.     THE CLUB DID NOT VIOLATE A.R.S. § 10-3610 BECAUSE ITS BYLAWS PERMITTED IT TO TREAT ITS MEMBERS DIFFERENTLY.

¶12          The Members next contend that A.R.S. § 10-3610 mandates equal treatment for all members of a non-profit, and that by permitting others to resign or settle, but suing the Members for attempting to do the same, the Club has arbitrarily treated its members differently and has therefore violated the statute.

¶13          The parties agree that the Members stopped paying their dues and fees and sent letters to the Club's Board asserting that they had resigned their memberships.  They also agree that the Club treated former members differently under similar circumstances.  For example, there is no dispute that the Club expelled two members for delinquency when they stopped paying their dues, and that those members were not required to pay the Club's $65,000 transfer fee upon expulsion.  The parties also agree

that the Club entered a settlement agreement by which another member was only required to pay $37,000 (including $17,000 in outstanding dues and $20,000 towards a transfer fee) upon divestment.

¶14        Such disparate treatment, however, was permitted under the bylaws and § 10-3610, which provides that "[a]ll members have the same rights and obligations with respect to . . . transfer, unless the . . . bylaws establish classes of membership with different rights or obligations or otherwise provide."  This section, like § 10-3620(A), makes the non-profit's bylaws the higher authority.  *See* Terence W. Thompson et al., 7 Ariz. Prac., *Corporate Practice* App'x D (2016) (noting that the Legislature modified this statute to clarify that bylaws may provide for different rights for its members even if different classes are not created).

¶15        Here, the bylaws gave the Club's Board discretion on how to enforce delinquent or non-payments, including by expulsion or "any and all other remedies allowed by law."  The Club therefore had discretion to redress some members' delinquent payments with expulsion, and others' — like the Members' — with a lawsuit to collect its dues and transfer fee.  And although the Members argue that such a change in treatment indicated that the bylaws did not actually prohibit resignation, the change was indicative only of how the Club enforced the rule, which was subject to change under its discretion.

¶16        Relying on *Capital Options Invest. v. Goldberg Bros. Commodities*, 958 F.2d 186, 189 (7th Cir. 1992), the Members also argue that, while the Club has discretion to discipline its members, the question of whether it exercised its discretion arbitrarily by filing lawsuits against some members and not others "raises a factual issue."  But the parties do not dispute any material facts regarding the former members' divestment, only the characterization of those facts — whether the former members were allowed to resign or whether they just received more lenient consequences for their non-payment.  Even if the facts are characterized as the Members suggest, the fact remains that the Club had a clear financial interest in recovering its dues and transfer fees, and its exercise of business discretion is protected — not prohibited — by the bylaws.  *See id.* ("Contractual discretion must be exercised reasonably and not arbitrarily or capriciously."); *see also United Dairymen of Ariz. v. Schugg*, 212 Ariz. 133, 140–41, ¶ 32 (App. 2006) ("Absent an abuse of discretion, business judgments will be respected by the courts.").

III.    THE CLUB'S BYLAWS GOVERN SUBSTANTIVE RIGHTS LIKE THE RESIGNATION OF ITS MEMBERS.

¶17        Citing A.R.S. § 10-3206, the Members finally argue that the Club's bylaws cannot restrict member resignation because "[s]uch unlimited dominion is not the province of corporate bylaws." But § 10-3206(B), which provides that "bylaws . . . may contain any provision for regulating and managing the affairs of the corporation," does not limit the dominion of bylaws to the extent that the Members suggest. *See* Thompson et al., 7 Ariz. Prac., *Corporate Practice* § 13:103 (offering an example form for nonprofit bylaws that includes restrictions on termination and transfer of membership). Because "managing the affairs" of the Club includes controlling its collection of dues and fees, as well as the total number of equity members, and because of the contractual nature in which the Members agreed to the bylaws, we hold that the Club's bylaws govern the resignation of its members.

**CONCLUSION**

¶18        For the foregoing reasons, we affirm the superior court's grant of summary judgment. The Club is entitled to costs and attorney's fees incurred on appeal upon compliance with ARCAP 21.

